# ILLINOIS OFFICIAL REPORTS

## Supreme Court

---

### *Prazen v. Shoop*, 2013 IL 115035

---

| | |
|---|---|
| Caption in Supreme Court: | JOSEPH E. PRAZEN, Appellee, v. MARVIN SHOOP, JR., as President of the Illinois Municipal Retirement Fund, *et al.*, Appellants. |
| Docket No. | 115035 |
| Filed | October 18, 2013 |
| Held <br> (*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | In prohibiting municipal employees from returning to work after retiring early under an incentive plan, and in imposing a forfeiture for doing so, the legislature did not intend to preclude a city from outsourcing supervision of its electrical department to a corporation controlled by an early retiree who had previously supervised that department—Pension Code. |
| Decision Under Review | Appeal from the Appellate Court for the Fourth District; heard in that court on appeal from the Circuit Court of Sangamon County, the Hon. John Schmidt, Judge, presiding. |
| Judgment | Affirmed. |

| Counsel on Appeal | Beth Janicki Clark, of Oak Brook, for appellants. |
|---|---|
| | James G. Fahey, of Sorling Northrup, of Springfield (Jeffrey T. Baker, of counsel), for appellee. |
| Justices | JUSTICE THOMAS delivered the judgment of the court, with opinion. |
| | Chief Justice Kilbride and Justices Garman, Karmeier, and Theis concurred in the judgment and opinion. |
| | Justice Freeman dissented, with opinion, joined by Justice Burke. |

**OPINION**

¶ 1      The Illinois Municipal Retirement Fund (IMRF) Board of Trustees (Board) determined that plaintiff, Joseph E. Prazen, forfeited his early retirement incentives (ERI), which amounted to $307,100.50, by returning to work for an IMRF employer in violation of section 7-141.1(g) of the Illinois Pension Code (Pension Code) (40 ILCS 5/7-141.1(g) (West 2010)). In reaching that determination, the Board found that the plaintiff's corporation was created as a "guise" to avoid the return-to-work prohibitions contained in the statute. On administrative review, the circuit court of Sangamon County confirmed. The appellate court reversed, however, finding that the Board did not have the authority to determine that plaintiff's actions were a guise for circumventing the forfeiture provisions found in section 7-141.1(g). 2012 IL App (4th) 120048, ¶ 37.

¶ 2      The Board filed a petition for leave to appeal with this court (Ill. S. Ct. R. 315 (eff. Feb. 26, 2010)), and we allowed the petition. For the reasons that follow, we affirm the appellate court's judgment.

¶ 3                       BACKGROUND

¶ 4      On December 31, 1998, plaintiff retired from his position as superintendent of the electrical department of the City of Peru, Illinois (City), under the early retirement incentive plan (ERI plan) that had been adopted by the City pursuant to section 7-141.1 of the Pension Code. Prior to his retirement, plaintiff purchased five years of age enhancement credit that boosted his years of service to 32.833. At the time of retirement, his annual salary was $82,284.20.

¶ 5      Three years earlier, in 1995, plaintiff formed a business known as Peru Development Land Trust (PDLT) with the then-mayor of Peru, Donald Baker. The purpose of PDLT was to renovate and convert real estate. In 1995, PDLT purchased a vacant building with the intention of turning it into condominiums. The renovation required extensive electrical

upgrades and modifications. Plaintiff planned to perform this work through his business, Electrical Consultants, Ltd. (ECL), which at that time was not yet incorporated.

¶ 6     On December 18, 1998, approximately two weeks before his retirement from his job with the City, plaintiff incorporated ECL. At the time of incorporation, he was the secretary and president of the corporation. Plaintiff's wife later took over as secretary and president.

¶ 7     On December 21, 1998, three days after ECL's incorporation and 10 days prior to plaintiff's retirement, ECL and the City entered into a management and supervision agreement for operation of the electrical department (the Agreement) to begin on January 1, 1999, one day after plaintiff retired. According to the affidavit of Mayor Donald Baker, who signed the Agreement on behalf of the City, it was the City's intent in entering into the Agreement to buy itself more time to find a replacement for plaintiff. It was also the intent of the City to have the liability for performance of the Agreement to be placed with ECL and not plaintiff personally.

¶ 8     Under the Agreement, ECL was to provide a full-time person to perform the contractor's duties for the City for a term of three years, with the first year of compensation set at $89,816.74 to be paid on a biweekly basis to ECL. The Agreement stated that "[a]ll work, services, and other functions furnished or to be performed by [ECL] for the City *** shall be in [ECL's] position as an independent contractor and to no extent and in no manner shall either [ECL] or any of its personnel *** be regarded as an employee, servant, or agent of the City." The Agreement gave the City the right to terminate it "upon reasonable cause determined within the City's sole discretion" following a 30-day written notice to ECL. There was no corresponding right on the part of ECL to terminate, and the initial term of the Agreement was for a three-year period. The Agreement between ECL and the City was extended eight times following its initial execution. It was not until the parties executed an eighth rider to the Agreement in August 2008 that ECL was also given the right to terminate the Agreement with a 30-day written notice.

¶ 9     Once prior to the execution of the Agreement between ECL and the City and twice afterwards, plaintiff's attorney, Douglas Schweickert, who was also outside legal counsel for the City, contacted IMRF on plaintiff's behalf to inquire about any impact the structure of the Agreement might have on plaintiff's IMRF pension. Schweickert documented these conversations with the IMRF in three letters that he wrote to plaintiff.

¶ 10    The first letter—dated September 15, 1998, which was over two months before ECL's incorporation and plaintiff's retirement from the City—stated that an IMRF representative had advised Schweickert that "a former employee who elected the Early Retirement Incentive may work for a non-IMRF employer." It was explained to Schweickert that the City could contract with a corporation for certain services even though the corporation employs a former City employee who elected the early retirement incentive. According to Schweickert, the IMRF representative also told him that "a former City employee may also contract with an IMRF employer as an independent contractor."

¶ 11    In the second letter dated March 21, 2002, Schweickert informed plaintiff that he had again contacted IMRF at plaintiff's request. This time an IMRF representative confirmed that everything in the September 1998 letter still applied and that there had been no changes in

IMRF regulations.

¶ 12   In the last letter dated November 19, 2002, Schweickert explained to plaintiff as follows:

"[The IMRF representative] confirmed that a retired 'early out' IMRF employee may work for a separate corporation which is then contracted to do work for the City from which the IMRF employee retired. I specifically questioned whether that retired IMRF employee may be an owner of the corporation contracting with the City. She stated that was permiss[i]ble, but she added that the corporation cannot just be a guise to avoid the IMRF regulations. Specifically, if the corporation hires itself out to the general public in addition to the municipality for which it has contracted, that would be fine."

Schweickert suggested to plaintiff that he should advertise to expand ECL's visibility and hire other employees, even if only for brief assignments.

¶ 13   ECL employed three people during its existence—plaintiff, his wife Diane, and their daughter Natalie. The City paid ECL biweekly, as called for by the Agreement. ECL then paid its employees. Plaintiff, Diane and Natalie received W-2 forms from ECL for each year they worked for the corporation.

¶ 14   On February 17, 2009, ECL informed the City in writing that it would be terminating the Agreement effective March 18, 2009, as allowed by the eighth rider extending the Agreement. ECL was voluntarily dissolved on November 30, 2009. After the Agreement between the City and ECL was terminated, the City continued to rely upon independent contractors to perform the duties described in the Agreement.

¶ 15   On November 5, 2010, nearly one year after ECL was dissolved and almost 12 years after plaintiff retired, general counsel for IMRF notified plaintiff by letter that the IMRF made a staff determination that plaintiff's continued "relationship" with the City after his 1999 retirement violated the provisions of section 7-141.1(g) of the Pension Code. Subsection (g) of section 7-141.1 prohibits an annuitant who has received any age enhancement or creditable service under ERI from later either accepting "employment with" or entering into a "personal services contract with" an IMRF employer. 40 ILCS 5/7-141.1(g) (West 1998). Attached to the letter were new calculations based on plaintiff's retirement at 27.333 years and showing a $307,100.50 overpayment as a result of plaintiff's ERI violation. The letter did not state how IMRF would collect the overpayment from plaintiff.

¶ 16   Plaintiff timely appealed the staff determination to the IMRF benefit review committee. The IMRF benefit review committee conducted hearings on June 23, 2011, and July 21, 2011. The findings and conclusions of the IMRF benefit review committee stated in part as follows:

"The ability of the Board to determine whether or not [plaintiff] is an employee is irrelevant to this proceeding because no such determination is being made.

* * *

Under the facts of this appeal, [plaintiff] violated the provisions of Section 7-141[.1](g) because EC[L] was created as a guise to avoid the return to work prohibitions contained therein. More specifically, [plaintiff's] actions are contrary to

-4-

the intent of the return to work prohibitions, which were enacted to offer an [*sic*] mechanism to allow individuals who are at least age 50 with 20 years of service to purchase service time and thus retire with a higher benefit at an earlier age. ERI was created as a financial incentive to employers (they could either not replace the retiree or hire younger employees at a lower salary). Allowing an employee to retire with a higher benefit and yet return to work under a contract was exactly what the General Assembly was trying to avoid when it enacted the ERI statute with the return to work prohibitions. Specifically the Committee took the following into consideration when making this determination:

[1] The timing surrounding the creation and dissolution of EC[L].

[2] The timing surrounding the Agreement with the City as it relates to [plaintiff's] retirement.

[3] The *de minimis* nature of EC[L]'s employment outside the agreement with the City.

[4] The fact that [plaintiff], his wife, and his daughter were the only employees of EC[L].

[5] The fact that [plaintiff], at the time of the original execution of the Agreement, was both secretary and president of EC[L].

[6] The nature of the duties required under the Agreement and the fact that [plaintiff] alone fulfilled its requirement for a full-time staff person."

On July 22, 2011, the IMRF Board voted to uphold the administrative staff determination and adopted the findings and conclusions set forth in the Board's benefit review committee report. Plaintiff appealed to the circuit court of Sangamon County. The circuit court confirmed the Board's decision.

¶ 17        Plaintiff then appealed to the appellate court, which reversed, holding that an ERI annuitant must have accepted "employment with" or entered into a "personal services contract with" an IMRF participating municipality to be subject to the forfeiture provisions of section 7-141.1(g). 2012 IL App (4th) 120048, ¶ 38. Here, the Agreement was between the City and ECL—a distinct legal entity—not between the City and plaintiff. *Id.*

¶ 18        The appellate court also held that the legislature did not grant the IMRF Board power to find a corporation was created solely as a guise to circumvent the forfeiture criteria of section 7-141.1(g). *Id.* ¶ 37. In the appellate court's view, finding a corporation to be a guise under the present circumstances created a new condition—of which an annuitant has no notice, and which is in direct conflict with the two conditions for forfeiture listed in section 7-141.1(g). *Id.* Finally, the appellate court found that a determination that a corporation is a guise is akin to a determination that the corporate veil can be pierced. *Id.* ¶ 38. The appellate court concluded that "[w]hile the legislature gave the IMRF Board the power to make administrative decisions on participation and coverage necessary for carrying out the intent of the Fund, this general power does not include equitable remedies generally reserved for the courts." *Id.*

¶ 19        The Board filed a petition for leave to appeal with this court. We allowed that petition.

¶ 20                                                    ANALYSIS

¶ 21        The outcome of this case turns on the interpretation of a statute, and therefore it presents a question of law that we review *de novo*. *Board of Education, Joliet Township High School District No. 204 v. Board of Education, Lincoln Way Community High School District No. 210*, 231 Ill. 2d 184, 194 (2008); *Hooker v. Retirement Board of the Firemen's Annuity & Benefit Fund*, 2012 IL App (1st) 111625, ¶ 13. The primary objective in construing a statute is to ascertain and give effect to the intent of the legislature. *Chicago Teachers Union, Local No. 1 v. Board of Education of the City of Chicago*, 2012 IL 112566, ¶ 15. The most reliable indicator and best evidence of legislative intent is the language used in the statute itself, which must be given its plain and ordinary meaning. *Roselle Police Pension Board v. Village of Roselle*, 232 Ill. 2d 546, 552 (2009). Additionally, in determining the legislative intent of a statute, a court may consider not only the language used, but also the reason and necessity for the law, the evils sought to be remedied, and the purposes to be achieved. *Williams v. Staples*, 208 Ill. 2d 480, 487 (2004). Words and phrases should be construed in light of other relevant provisions of the statute and must not be interpreted in isolation. *Id.* Each word, clause and sentence of a statute must be given a reasonable meaning, if possible, and should not be rendered superfluous. *Chicago Teachers Union*, 2012 IL 112566, ¶ 15.

¶ 22        At issue in this case is the ERI forfeiture provision of section 7-141.1(g) of the Pension Code. That section provides in relevant part as follows:

> "An annuitant who has received any age enhancement or creditable service under this Section and thereafter accepts *employment with* or enters into a *personal services contract with* an employer under this Article thereby forfeits that age enhancement and creditable service ***. A person forfeiting early retirement incentives under this subsection (i) must repay to the Fund that portion of the retirement annuity already received which is attributable to the early retirement incentives that are being forfeited, (ii) shall not be eligible to participate in any future early retirement program adopted under this Section, and (iii) is entitled to a refund of the employee contribution paid under subsection (f). The Board shall deduct the required repayment from the refund and may impose a reasonable payment schedule for repaying the amount, if any, by which the required repayment exceeds the refund amount." (Emphases added.) 40 ILCS 5/7-141.1(g) (West 2010).

¶ 23        Before this court, the parties differ as to the proper interpretation to be given section 7-141.1(g). The Board argues that the terms "employment with" and "personal services contract with" are ambiguous. The Board acknowledges that it did not make any specific determination in the proceeding below that either of these two conditions were violated. Nonetheless, the Board argues here that those terms should be liberally construed to effectuate the intent of the statute. The Board contends that a look at section 7-141.1 of the Pension Code as a whole shows that it was enacted as a cost savings device to allow highly paid senior employees to retire early and either not be replaced at all or be replaced with employees earning a lower salary. Therefore, the Board suggests that section 7-141.1(g) be read so as to take away any incentive for a worker to retire early, create a corporation,

become employed by that corporation, contract with the former IMRF employer through that corporation and then simply go back to work at essentially the same job. Additionally, the Board argues that even if plaintiff did not specifically violate either of the two expressed conditions for forfeiture contained in the statute, the Board nonetheless had the authority to find a forfeiture based on the corporate arrangement set up by plaintiff.

¶ 24 We first reject the Board's argument that the terms in question are ambiguous. Neither "employment" nor "personal services contract" are defined in the Pension Code, but we find the terms to be sufficiently plain and clear nonetheless. Even though the term "employment" is not defined, the term "employee" is defined in the Pension Code in relevant part as a person who (1) is paid "for the performance of personal services or official duties out of the general fund of a municipality" or a fund controlled by a municipality, or (2) "[u]nder the usual common law rules applicable in determining the employer-employee relationship, has the status of an employee with a municipality." 40 ILCS 5/7-109 (West 2010). The appellate court found that to be "employed with" an IMRF employer, a person must first fit the definition of "employee." 2012 IL App (4th) 120048, ¶ 29. We agree with that assessment. Here, plaintiff was not employed with the City after his retirement in 1998. Rather, plaintiff was employed by ECL, a separate legal entity.

¶ 25 The Board does not dispute that plaintiff was no longer an "employee" of the City once he retired in 1998. However, the Board resists application of the definition of "employee" found in section 7-109 of the Pension Code to inform the decision of what constitutes "employment with" under section 7-141.1(g). Instead, the Board relies upon a Black's Law Dictionary definition of "employment," which defines it as "[w]ork for which one has been hired and is being paid by an employer." Black's Law Dictionary 566 (8th ed. 2004). But this definition does not support the Board's position either, as the Board hired and paid ECL, not plaintiff. Thus, even under the definition of employment supplied by the Board, plaintiff did not enter into "employment with" an IMRF employer following his retirement on December 31, 1998.

¶ 26 We also find the term "personal services contract" to be clear. Although the Pension Code does not define the phrase and there is a dearth of Illinois case law discussing its parameters, courts in other jurisdictions have been almost uniform in defining it as " '[a] contract which contemplates the performance of personal services involving the exercise of special knowledge, judgment, taste, skill, or ability.' " *Doltz v. Harris & Associates*, 280 F. Supp. 2d 377, 388 (E.D. Pa. 2003) (quoting *In re Compass Van & Storage Corp.*, 65 B.R. 1007, 1011 (Bankr. E.D.N.Y. 1986)). Typical personal services contracts are ones that require a specific person to perform the contract with "rare genius and extraordinary skill" and are nontransferable, nonassignable and are therefore personal. *Taylor v. Palmer*, 31 Cal. 240, 247-48 (1866); see also *In re Herlan*, No. 09-2665, 2010 WL 56019, at *7 (Bankr. N.D. W. Va. 2010). That an agreement is between two corporations and does not identify any individual as being material to its performance are facts that weigh strongly against (if they are not indeed fatal) to construing the agreement as a "personal services contract." *Fransmart, LLC v. Freshii Development, LLC*, 768 F. Supp. 2d 851, 860-61 (E.D. Va. 2011) (mem. op.).

¶ 27 Black's Law Dictionary appears to be in full agreement with the above-noted principles

-7-

culled from the case law. According to Black's Law Dictionary, a "personal contract" is defined as "[a] contract that binds a person but not that person's heirs or assignees because the contract requires a personal performance for which there is no adequate substitute." Black's Law Dictionary 347 (8th ed. 2004).[1]

¶ 28 In the present case, the Board did not make a determination that plaintiff entered into a "personal services contract with" the City. But the Board nevertheless now argues that the term is ambiguous and that plaintiff should be deemed to have entered into such a contract. We conclude, however, that the term is clear and unambiguous and that any determination that plaintiff had entered such a contract based on the record before us would have been clearly erroneous given the undisputed facts. Here, we again note that the Agreement was between the City and ECL. More importantly, the Agreement did not require that plaintiff personally perform any of the services described in it. Rather, the Agreement expressly provided that ECL was an independent contractor and that ECL was simply responsible to "provide a qualified full time person to perform the duties" described. Again, nothing in the Agreement required plaintiff to perform any personal services. We further note that even though ECL only had three employees during its existence and plaintiff was the only one of those three qualified to perform the duties mentioned, there was nothing in the Agreement that would have prevented ECL from hiring another qualified contractor to perform the supervision and management services listed. Thus, plaintiff's personal performance of the duties was not material to the contract. Under these circumstances, plaintiff did not enter into a personal services contract with the City.

¶ 29 We now turn to the Board's argument that it had the authority to determine that plaintiff forfeited a portion of his pension because, in its view, ECL was a guise to circumvent the restrictions of section 7-141.1(g). In support of its argument, the Board relies upon the general grant of authority under section 7-200 of the Pension Code to make "administrative decisions on participation and coverage" to carry out the intent of the fund. See 40 ILCS 5/7-200 (West 2010). The Board also relies upon the general fiduciary duty on the part of the boards of all Illinois pension funds to act prudently in accordance with the provisions of the Pension Code. See 40 ILCS 5/1-109 (West 2010); see also *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497, 544 (2006) (an important function of a pension board is to ensure adequate financial resources to pay benefits to those who qualify by screening unqualified or fraudulent claims).

---

[1]Additionally, Black's Law Dictionary simply defines a "service contract" as "[a] contract to perform a service." Black's Law Dictionary 348 (8th ed. 2004). Moreover, we note that under certain federal regulations governing fairness in obtaining government contracts, the term "personal services contract" is a term of art that would be of no benefit to the Board's position in the present case. Under federal regulation, a "personal services contract" is one in which the contractor's employees are under the direction and supervision of the government, but a "[n]onpersonal services contract" is one under which the contractor is an independent contractor. See, *e.g.*, 48 C.F.R. § 37.101 (2013); 32 C.F.R. §§ 107.1 to 107.6 (2013); see also *Horn v. United States*, 98 Fed. Cl. 500, 502 (2011); *Glen v. Performance Anesthesia, P.A.*, No. 5:09-CV00309-BR (Aug. 27, 2010) (unpublished order).

¶ 30     We have no disagreement with the principles cited by the Board, but we find that the Board's attempt to override the two specific conditions for forfeiture and find a third ground upon which forfeiture may rest is misplaced given the lack of any clear intent in the pension statute to allow the Board to find a forfeiture under the present circumstances.

¶ 31     The legislative findings and declarations in subsection (a) of section 7-141.1 state as follows:

"(a) The General Assembly finds and declares that:

(1) Units of local government across the State have been functioning under a financial crisis.

(2) This financial crisis is expected to continue.

(3) Units of local government must depend on additional sources of revenue and, when those sources are not forthcoming, must establish cost-saving programs.

(4) An early retirement incentive designed specifically to target highly-paid senior employees could result in significant annual cost savings.

(5) The early retirement incentive should be made available only to those units of local government that determine that an early retirement incentive is in their best interest.

(6) A unit of local government adopting a program of early retirement incentives under this Section is encouraged to implement personnel procedures to prohibit, for at least 5 years, the rehiring (whether on payroll or by independent contract) of employees who receive early retirement incentives.

(7) A unit of government adopting a program of early retirement incentives under this Section is also encouraged to replace as few of the participating employees as possible and to hire replacement employees for salaries totaling no more than 80% of the total salaries formerly paid to the employees who participate in the early retirement program.

It is the primary purpose of this Section to encourage units of local government that can realize true cost savings, or have determined that an early retirement program is in their best interest, to implement an early retirement program." 40 ILCS 5/7-141.1(a) (West 2010).

¶ 32     Furthermore, subsection (b) of the same statutory section then requires that in order to validly join the early retirement incentives program, a municipality must adopt an ordinance that, among other things, requires the municipality to resolve to "use its best efforts" to limit the number of employees who replace employees who retire early, or limit the salaries paid to employees who replace the employees who retire early under the ERI program. 40 ILCS 5/7-141.1(b) (West 2010). Importantly, subsection (b) continues on to merely require that the municipality resolve that "a person who retires under the [ERI] program shall lose those incentives if he or she later accepts employment with any IMRF employer *in a position for which participation in IMRF is required or is elected by the employee.*" (Emphasis added.) 40 ILCS 7/5-141.1(b) (West 2010).

¶ 33    From the above-quoted provisions, it is clear that the legislature recognized that local governments have been operating under financial crisis, that the ERI program is designed to target highly paid senior employees, and that implementation of the program could result in cost savings. However, nothing in the legislative declarations evinces a clear intent that the ERI forfeiture prohibitions be interpreted so as to result in forfeiture in a situation like the present one. First, we note that subsection (a), which sets forth the intent and purpose of the statute, provides that a participating municipality is merely "encouraged" (not required) either to not replace a retiring employee or to replace him at a lesser salary. Also, while the legislature meant to encourage this, it also recognized that in some cases it would not be possible to get by without replacing the retiring employee at the same high salary. Second, we note that a participating municipality is merely "encouraged" to prohibit (and only for five years) the rehiring (by independent contract or payroll) of employees who receive ERI. Finally, in subsection (b), the participating municipality is simply required to resolve that a person who retires early forfeits his ERI if he accepts "employment with any IMRF employer in a position for which participation in IMRF is required or is elected by the employee." 40 ILCS 5/7-141.1(b) (West 2010). Here, of course, plaintiff did not accept "employment with" an IMRF employer after his retirement on December 31, 1998, and it is undisputed that his position with ECL after his retirement did not require IMRF participation nor was such participation elected (and in fact it could not have been elected).

¶ 34    Thus, it appears that contrary to the Board's argument, the intent of the legislature was actually fulfilled in this case. ECL's contract with the City did not allow for plaintiff's continued participation in the IMRF, as plaintiff was not an employee of the City. The City thus did not have to make pension contributions as it would have had to do had it hired an employee. Undoubtedly, the City also saved by avoiding paying other employee benefits that would have been necessary in an employment context. We also note that ECL was bound by the Agreement for an initial three-year term without the same right to terminate that the City possessed upon 30 days written notice. This provision allowed the City the option of searching for an employee to fill the role needed or of simply continuing to rely upon ECL.

¶ 35    On the other hand, we realize that the arrangement effected in the present case was a lucrative one for plaintiff. He was allowed to retire early and was then able to earn significant income through ECL's contract with the City. However, the fact that plaintiff may have taken advantage of a windfall or that the Board sees a loophole in the statute does not mean that this court may "sit as a superlegislature to weigh the wisdom of legislation [or] to decide whether the policy which it expresses offends the public welfare." (Internal quotation marks omitted.) *Roselle*, 232 Ill. 2d at 557. We must construe and apply statutory provisions as they are written and cannot rewrite them to make them consistent with the judiciary's view of orderliness and public policy. *Id.* at 558.

¶ 36    It is well settled that an administrative agency is a creature of statute and therefore any power or authority claimed by it must find its source in the provisions of the statute that created it. *County of Knox ex rel. Masterson v. The Highlands, LLC*, 188 Ill. 2d 546, 554 (1999). Moreover, a determination of the scope of the agency's power and authority is a question of law for the judiciary to resolve and is not an issue to be finally determined by the agency itself. *Id.*

¶ 37     Here, the legislature did not grant the Board power to find a corporation was a guise to circumvent the forfeiture provisions set forth in section 7-141.1(g) of the Pension Code. The legislature granted the Board the power to "carry on generally any other reasonable activities" necessary to carry out the intent of the IMRF. See 40 ILCS 5/7-200 (West 2010). We agree with the appellate court that creating a new condition for forfeiture—of which the annuitant has no notice from the clear terms of the statute itself—is not a reasonable activity. We also agree that had the legislature intended to give the Board discretion to invent new conditions to find forfeiture of ERI, it surely would have stated so. See 2012 IL App (4th) 120048, ¶ 37. It would be profoundly unjust to uphold the forfeiture in the present case where the statute clearly lists only two conditions for forfeiture and neither was violated. If the legislature intended further conditions to apply, this would be a situation that would cry out for legislative line-drawing. The IMRF Board's superimposed criteria appears to be vague, unworkable and evolving over time.

¶ 38     We will not presume that the legislature intended to create a condition for forfeiture of pension benefits where the statute is silent on the subject. See *Shields v. Judges' Retirement System of Illinois*, 204 Ill. 2d 488, 496-97 (2003). It is the dominion of the legislature to enact laws and the courts to construe them, and we can neither restrict nor enlarge the meaning of an unambiguous statute. *Id.* at 497.

¶ 39     Moreover, it is beyond dispute that to the extent there is any question as to legislative intent and the clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioner. *Taddeo v. Board of Trustees of the Illinois Municipal Retirement Fund*, 216 Ill. 2d 590, 596 (2005); *Shields*, 204 Ill. 2d at 494; see also *Roselle*, 232 Ill. 2d at 552-53 (if the legislative intent is "obvious" from the language of the statute, it will be given effect regardless of the well-settled canon that statutory provisions of a pension statute should be liberally construed in favor of the pensioner). To adopt the Board's construction in this case, then, would be inconsistent with both our obligation to construe pension statutes liberally in favor of the pensioner and to give effect to the plain meaning of the words used in the statute.

¶ 40     We also acknowledge the general rule that the interpretation of a statute by the agency charged with its administration is given some deference; but this rule is not binding and if the interpretation is erroneous, it will be rejected. *Taddeo*, 216 Ill. 2d at 595. Here, the Board's interpretation is not only erroneous, but is one that appears to have been inconsistent and evolving over the years.

¶ 41     The IMRF's inconsistency over the years is shown by the fact that in September 1998, two months before plaintiff retired, the IMRF advised plaintiff's attorney that the City could contract with a corporation for services even though the corporation employs a former City employee who elected the ERI and also that a former City employee could contract with an IMRF employer as an independent contractor. This interpretation was confirmed by the IMRF a few years later in March 2002. Seven months later, however, the IMRF told plaintiff's counsel that a retired IMRF employee may be the owner of the corporation contracting with the City, but the corporation cannot just be a guise and would have to hire itself out to the general public also. This apparently represented a retreat from IMRF's earlier position that the City could contract with a retired former IMRF employee on an

-11-

independent-contractor basis. Then, in July 2011, when the IMRF Board made its determination that plaintiff forfeited a portion of his pension because his corporation was a "guise," it relied upon a host of never-before-mentioned factors, including the nature and amount of the corporation's non-City contracts, the number of employees in the corporation, and the timing surrounding its creation.

¶ 42    At any rate, we note that our determination of the outcome in this case would have been different if, from our reading of the statute as a whole, we were able to conclude that the legislature had a clear intent to inhibit the sort of corporate contract involved in this case—*i.e.*, one that outsourced the supervision of the City's electrical department to a legally valid corporation controlled by a retired IMRF employee—by making the retired employee's ERI subject to forfeiture on account of the arrangement. But we can find no such intent in this case.

¶ 43    From our reading of the statute, we believe that it is possible that the General Assembly believed that prohibiting an annuitant from being employed by a corporation (regardless of the annuitant's role in forming the corporation) that contracts with the annuitant's former IMRF employer would hamper a local governmental entity's ability to maintain a quality workforce. Or the General Assembly may have believed that such a bar was unnecessary because a municipality should be able to choose on its own whether entering into a contract with a self-incorporated annuitant through a corporation on an independent-contractor basis was a better fiscal option than hiring an employee to do the same work and having to pay the commensurate employee benefits.

¶ 44    We believe that had the General Assembly wanted to make a continued "relationship" with an IMRF employer through a corporation grounds for forfeiture under section 7-141.1(g), then the statute would have spoken directly to the matter. We therefore find, as the appellate court did, that if the ruling we reach here is "something the General Assembly wanted to avoid, then legislative action is required" to address the problem directly and provide sufficient guidelines for the Board to follow in making its determination. See 2012 IL App (4th) 120048, ¶ 40.

¶ 45    Our resolution of the foregoing issues renders it unnecessary to address the remaining issues raised by the parties.

¶ 46                                        CONCLUSION

¶ 47    For all of the above reasons, we conclude that the Board had no authority under the Pension Code to conclude that plaintiff's legally valid corporation was a guise to circumvent the forfeiture provisions of section 7-141.1(g). Accordingly, we affirm the judgment of the appellate court.

¶ 48    Affirmed.

¶ 49    JUSTICE FREEMAN, dissenting:

¶ 50    The majority today holds that the Illinois Municipal Retirement Fund (IMRF) Board of

-12-

Trustees (Board), a fiduciary under the Illinois Pension Code (Pension Code), had no authority to determine that plaintiff's corporation was a guise to circumvent the forfeiture provisions of the Early Retirement Incentive (ERI) statute. In other words, under the majority's decision the Board, a fiduciary, had no authority to perform its fiduciary function. I disagree, and therefore respectfully dissent.

¶ 51                                                    I

¶ 52    On December 31, 1998, plaintiff retired from his position as superintendent of the electrical department of the City of Peru, Illinois (City), under the ERI program the City had adopted pursuant to section 7-141.1 of the Pension Code (40 ILCS 5/7-141.1 (West 2010)). This program allowed participating employees to purchase age enhancement credits which in turn allowed the employee to retire early with a higher pension. Prior to his retirement, plaintiff purchased five years of age enhancement credit, so that, according to the record, his pension was based on 32.833 years of service credit rather than 27.333 years.

¶ 53    On December 18, 1998, about two weeks before his retirement, plaintiff incorporated Electrical Consultants, Ltd. (ECL). At the time of incorporation, plaintiff was the secretary and president of ECL. Plaintiff's wife, Diane, later took over as secretary and president. During its existence, ECL never had more than three employees: plaintiff, his wife, and their daughter Natalie.

¶ 54    On December 21, 1998, three days after ECL's incorporation and 10 days prior to plaintiff's retirement, ECL and the City entered into a "Management and Supervision Agreement for Operation of the Electric Department" (Agreement). The three-year Agreement began on January 1, 1999, the day after plaintiff retired. It required ECL to provide a qualified full-time person to perform the contractor's duties for the City, including electrical management and supervisory services. Plaintiff was the only one of ECL's three employees qualified to perform these duties.

¶ 55    Under the Agreement, the City paid ECL $89,816.74 for the first year (about $7,000 more than plaintiff's $82,284.20 annual salary when he retired), with increases in subsequent years based on the Consumer Price Index. The Agreement was extended eight times, with its final term ending in March 2009. The Agreement thus was in effect for approximately 10 years, during which the City paid ECL a total of $1,075,398.92. During this same period, plaintiff continued to receive his enhanced ERI pension. ECL was dissolved on November 30, 2009, approximately eight months after its Agreement with the City ended.

¶ 56    The Agreement and each of the eight riders extending it were executed on behalf of the City by then-Mayor Donald Baker, who was also plaintiff's business partner.[2] According to Baker's affidavit, it was the City's intent, in entering the Agreement, to contract with ECL "only until such time as a permanent replacement for the position of Superintendent of the Electrical Department could be located." Baker averred, in addition, that the City intended

---

[2]In 1995, plaintiff and Baker, among others, created Peru Development Land Trust (PDLT) in order to renovate and convert real estate in Peru, Illinois.

to find such a replacement "as quickly as possible."

¶ 57    On three occasions (one in September 1998, one in March 2002 and the third in November 2002), plaintiff's attorney, Douglas Schweickert, who was also outside legal counsel for the City, contacted IMRF on plaintiff's behalf to inquire about any impact the Agreement might have on plaintiff's pension. Schweickert documented these conversations with IMRF representatives in three letters he wrote to plaintiff. These letters generally indicate that the IMRF representatives assured Schweickert that plaintiff's corporate arrangement with the City was acceptable. In the third letter, Schweickert told plaintiff the IMRF representative specifically indicated that an ERI retiree could work for a separate corporation which contracted to do work for the City, even if the ERI retiree was an owner of that corporation. In that event, however, the corporation could not just be a guise to avoid IMRF regulations.

¶ 58    On April 5, 2009, a few weeks after the City's Agreement with ECL ended, Scott Harl was elected the City's new mayor. He was sworn in on April 27. According to his affidavit, he chose not to fill the position of superintendent of the electrical department, but named a department foreman "as Supervisor of the Electrical Department." Mayor Harl averred, in addition, that for duties that typically fall under the purview of the superintendent, such as engineering tasks and management, the City relies on "outside vendors, engineering companies, and the like."

¶ 59    On November 5, 2010, the IMRF general counsel notified plaintiff by letter that the IMRF made a staff determination that plaintiff's continued relationship with the City after his retirement triggered the forfeiture provisions of section 7-141.1(g) of the Pension Code. Plaintiff appealed to the IMRF Benefit Review Committee, which concluded plaintiff forfeited his ERI benefits because ECL, plaintiff's corporation, "was created as a guise to avoid the return to work prohibitions" of section 7-141.1(g). The IMRF Board confirmed the decision of the Benefit Review Committee, including the determination that plaintiff forfeited his early retirement incentives in the amount of $307,100.50, which was to be recovered by withholding a percentage of his retirement annuity (pension payments) over a reasonable period.[3] The circuit court confirmed the Board's decision, and the appellate court reversed, vacating the Board's decision. 2012 IL App (4th) 120048. The majority today affirms the judgment of the appellate court.

¶ 60                                                              II

¶ 61    Under subsection (g) of section 7-141.1 (40 ILCS 5/7-141.1(g) (West 2010)), an ERI annuitant such as plaintiff who "accepts employment with or enters into a personal services contract with" an IMRF employer thereby forfeits his age enhancement and creditable service benefits. In concluding plaintiff forfeited his ERI benefits, the Board made no specific determination that either of these two statutory conditions were met. Instead, the Board

---

[3]According to the Board, from 1998-2010 plaintiff received pension payments totaling $668,349.95. IMRF sought to recover only that portion attributable to plaintiff's early retirement, which was $307,100.50.

-14-

concluded that plaintiff's corporation, ECL, was created as a guise to avoid the section 7-141.1(g) prohibitions against accepting employment with or entering into a personal services contract with an IMRF employer. In other words, the Board determined that plaintiff committed a fraud against the IMRF.

¶ 62    My colleagues in the majority reject this reasoning, holding that the Board "had no authority under the Pension Code to conclude that plaintiff's legally valid corporation was a guise to circumvent the forfeiture provisions of section 7-141.1(g)." *Supra* ¶ 47. The majority emphasizes that an administrative agency such as the Board "is a creature of statute and therefore any power or authority claimed by it must find its source in the provisions of the statute that created it." *Supra* ¶ 36 (citing *County of Knox ex rel. Masterson v. The Highlands, LLC*, 18 Ill. 2d 546, 554 (1999)).

¶ 63    The only two conditions for forfeiture listed in subsection (g) are (1) accepting employment with or (2) entering into a personal services contract with an IMRF employer. In the majority's view, the terms "employment" and "personal services contract" are clear and unambiguous. Under the plain meaning of "employment," plaintiff was not employed with the City after his retirement in 1998. "Rather, plaintiff was employed by ECL, a separate legal entity." *Supra* ¶ 24. In addition, plaintiff clearly "did not enter into a personal services contract with the City." *Supra* ¶ 28.

¶ 64    The majority finds no support in the statute for what it considers a "new condition" for forfeiture—the Board's finding that ECL was a "guise" to avoid the return-to-work prohibitions of subsection (g). The majority states:

> "We will not presume that the legislature intended to create a condition for forfeiture of pension benefits where the statute is silent on the subject. [Citation.] It is the dominion of the legislature to enact laws and the courts to construe them, and we can neither restrict nor enlarge the meaning of an unambiguous statute." *Supra* ¶ 38.

¶ 65    The majority thus holds that so long as there is literal compliance with subsection (g), there is no forfeiture of ERI benefits, regardless of the nature of the corporate or other arrangement utilized to reach that result. According to the majority, the Board has no authority to look into the arrangement to determine if it is fraudulent.

¶ 66    I disagree. The majority's holding runs directly counter to section 1-109 of the Pension Code, which applies to all pension funds created within the Pension Code. Section 1-109 charges the boards of these funds as fiduciaries to act prudently and in "accordance with the provisions of the Article of the Pension Code governing the retirement system or pension fund." 40 ILCS 5/1-109 (West 2010).

¶ 67    This court has clearly described this fiduciary duty. In *Marconi v. Chicago Heights Police Pension Board*, 225 Ill. 2d 497 (2006),[4] we stated:

---

[4]*Marconi* was a *per curiam* opinion in which Justices Burke and Kilbride took no part. Justice Fitzgerald dissented, with opinion. Joining in the *per curiam* opinion were Chief Justice Thomas and Justices Freeman, Garman, and Karmeier.

"This fiduciary duty, however, is owed to *all* participants in the pension fund, not just plaintiff. Perhaps the most important function of a pension board is to ensure adequate financial resources to cover the Board's obligations to pay current and future retirement and disability benefits to those who qualify for such payments. *An important part of this responsibility involves the screening of unqualified or fraudulent disability claims, so that funds are not unfairly diverted to undeserving applicants.*" (Emphasis in original and added.) *Id.* at 544.

¶ 68    This section 1-109 fiduciary duty bears some semblance to, but is different from, the common law remedy known as piercing the corporate veil. Under this remedy, courts in some circumstances will disregard the corporate entity and find shareholders, directors, or officers personally liable for corporate obligations. *Ted Harrison Oil Co. v. Dokka*, 247 Ill. App. 3d 791, 795 (1993); *Alpert v. Bertsch*, 235 Ill. App. 3d 452, 460 (1992); *Gallagher v. Reconco Builders, Inc.*, 91 Ill. App. 3d 999, 1004-05 (1980). Situations where a court may pierce the corporate veil include circumstances where adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences. *Ted Harrison Oil Co.*, 247 Ill. App. 3d at 795; *Alpert*, 235 Ill. App. 3d at 460; *Gallagher*, 91 Ill. App. 3d at 1004. The gist of the remedy of piercing the corporate veil is that "courts will not permit themselves to be blinded or deceived by 'mere' forms of law—they will penetrate behind the screen of a corporate entity to deal with the substance of the transaction and the relationship of the parties involved." Ronald J. Broida, *The History of the Development of the Remedy of "Piercing the Corporate Veil",* 65 Ill. B.J. 522, 523 (1977).

¶ 69    Just as courts sometimes encounter circumstances where it is necessary to disregard the corporate entity in order to prevent fraud or injustice, pension boards face similar circumstances. Courts draw their authority to pierce the corporate veil from the common law. In the case of pension boards, the fiduciary duty is established by statute.

¶ 70    In the case at bar, plaintiff's corporate arrangement with the City presented a situation sufficient to authorize the Board, as a fiduciary, to examine the arrangement to determine whether it was fraudulent. Recall some of the details of plaintiff's arrangement. About two weeks before he retired as superintendent of the City's electric department, plaintiff incorporated ECL. Three days later, ECL entered into a management and supervision agreement with the City for operation of the electric department. The Agreement, which began on January 1, 1999, the day after plaintiff retired, required ECL to provide a qualified full-time person to perform the contractor's duties for the City, including electrical management and supervisory services. Of ECL's three employees—plaintiff, his wife, and their daughter—plaintiff was the only one qualified to perform these duties.

¶ 71    Under the Agreement, the City paid ECL $89,816.74 for the first year (about $7,000 more than plaintiff's $82,284.20 annual salary when he retired), with increases in subsequent years based on the Consumer Price Index. The Agreement was extended eight times, with its final term ending in March 2009. The Agreement thus was in effect for approximately 10 years, during which the City paid ECL a total of $1,075,398.92. During this same period, plaintiff continued to receive his enhanced ERI pension. ECL was dissolved on November 30, 2009, approximately eight months after its Agreement with the City ended.

¶ 72 The Agreement and each of the eight riders extending it were executed on behalf of the City by then-Mayor Donald Baker, who was also plaintiff's business partner. On April 5, 2009, a few weeks after the City's Agreement with ECL ended, Scott Harl was elected the City's new mayor. He was sworn in on April 27.

¶ 73 The majority's holding today essentially bars the Board from fulfilling its important fiduciary role of looking into or policing corporate arrangements such as plaintiff's, or any other potentially fraudulent circumstance, in order to ensure that funds are not unfairly diverted to undeserving applicants. In other words, the Board, a fiduciary pursuant to section 1-109, has no authority to perform its fiduciary function. This cannot be what the legislature intended.

¶ 74 I strongly disagree with the majority's holding that the Board had no authority under the Pension Code to conclude plaintiff's corporation was a guise to circumvent the forfeiture provisions of section 7-141.1(g). I respectfully dissent.

¶ 75                                                        III

¶ 76 While I would hold the Board has authority to police potentially fraudulent claims to ensure that funds are not unfairly diverted to undeserving applicants, the question remains whether the Board properly applied that authority in the instant case. For example, should the Board be estopped from finding forfeiture where, as here, IMRF representatives apparently assured plaintiff's attorney, repeatedly, that plaintiff's corporate arrangement with the City was acceptable? The majority does not address this question here. Accordingly, I do not address it in this dissent.

¶ 77 JUSTICE BURKE joins in this dissent.