# Illinois Official Reports

## Supreme Court

***Kanerva v. Weems*, 2014 IL 115811**

| | |
|---|---|
| Caption in Supreme Court: | ROGER KANERVA *et al.*, Appellants, v. MALCOLM WEEMS *et al.*, Appellees. |
| Docket No. | 115811 |
| Filed | July 3, 2014 |
| Held<br>(*Note: This syllabus constitutes no part of the opinion of the court but has been prepared by the Reporter of Decisions for the convenience of the reader.*) | The State's subsidization of health insurance for its retired employees is a benefit of membership in a State pension system within the meaning of the pension protection clause of the Illinois Constitution of 1970; and where a 2012 enactment eliminated the statutory standards for the State's contributions to that health care coverage and substituted instead a new system for administrative determinations as to how much the State should pay, allegations that the challenged statute was void and unenforceable under the pension protection clause should not have been dismissed for failure to state a cause of action—remand. |
| Decision Under Review | Appeal from the Circuit Court of Sangamon County, the Hon. Steven H. Nardulli, Judge, presiding. |
| Judgment | Circuit court judgment reversed.<br>Cause remanded. |

Counsel on Appeal

Stephen A. Yokich, of Cornfield & Feldman LLP, of Chicago, for appellants Debra Bauer *et al.*

Edward J. Kionka, of Carbondale, and Thomas G. Maag and Peter J. Maag, of Wood River, for appellants Gordon Maag *et al.*

George W. Tinkham, of Springfield, and Rodney V. Taylor, of Christopher & Taylor, of Indianapolis, Indiana, for appellants Gary McDonal *et al.*

John M. Myers and Barbara K. Myers of Rabin & Myers, P.C., and Donald M. Craven and Esther J. Seitz, all of Springfield, for appellants Robert Kanerva *et al.*

Lisa Madigan, Attorney General, of Springfield (Michael A. Scodro, Solicitor General, and Richard S. Huszagh and Kate E. Pomper, Assistant Attorneys General, of Chicago, of counsel), for appellees.

Clinton A. Krislov, of Chicago, for *amicus curiae* Certified Classes of Participants in the City of Chicago Annuitant Healthcare Plans.

Stephen R. Patton, Corporation Counsel, of Chicago (Benna Ruth Solomon, Myriam Zreczny Kasper and Sara K. Hornstra, Assistant Corporation Counsel, and Michael B. Slade, R. Chris Heck and J. Michael Jones, of Kirkland & Ellis LLP, of counsel), for *amicus curiae* City of Chicago.

Justices

JUSTICE FREEMAN delivered the judgment of the court, with opinion.
Chief Justice Garman and Justices Thomas, Kilbride, Karmeier, and Theis concurred in the judgment and opinion.
Justice Burke dissented, with opinion.

**OPINION**

¶ 1    At issue in this appeal is the validity of Public Act 97-695 (eff. July 1, 2012), which amended section 10 of the State Employees Group Insurance Act of 1971 (Group Insurance Act) (5 ILCS 375/10 (West 2012)) by eliminating the statutory standards for the State's contributions to health insurance premiums for members of three of the State's retirement systems. In place of those standards, Public Act 97-695 requires the Director of the Illinois Department of Central Management Services to determine annually the amount of the health insurance premiums that will be charged to the State and to retired public employees. Plaintiffs include members of the State Employees' Retirement System (SERS), the State Universities Retirement System (SURS), and the Teachers' Retirement System of the State of Illinois (TRS), which are the three state retirement systems that are affected by Public Act 97-695. Plaintiffs brought four putative class actions challenging the constitutionality of Public Act 97-695. Each of the complaints alleged that Public Act 97-695 violates the pension protection clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5). Two of the complaints alleged a violation of the contracts clause (Ill. Const. 1970, art. I, § 16), and one complaint alleged a violation of the separation of powers clause (Ill. Const. 1970, art. II, § 1). In addition, certain plaintiffs sought injunctive relief or damages for common-law claims based on contract and promissory estoppel. On motion of defendants, the circuit court of Sangamon County dismissed all of the complaints, and plaintiffs appealed. This court granted a subsequent motion for direct review, pursuant to Supreme Court Rule 302(b) (eff. Oct. 4, 2011), and ordered that the appeals from the four consolidated cases be transferred to us. We subsequently allowed "certified classes of participants in the City of Chicago's annuitant healthcare programs" to file a brief as *amicus curiae* on behalf of plaintiffs and the City of Chicago to file a brief as *amicus curiae* on behalf of defendants (Ill. S. Ct. R. 345 (eff. Sept. 20, 2010)). For the reasons that follow, the judgment of the circuit court is reversed, and the cause is remanded for further proceedings.

¶ 2                              BACKGROUND

¶ 3    In addition to the wages they are paid, most public employees in Illinois receive additional benefits, including subsidized health care, disability and life insurance coverage, eligibility to receive a retirement annuity, and survivor benefits. Disability, retirement annuity and survivor benefits are governed by the Illinois Pension Code (40 ILCS 5/1-101 *et seq*. (West 2012)). For state employees, the program of group life and health insurance benefits, which is available to active employees, certain of their dependents, and certain retirees and their dependent beneficiaries, was previously governed by the State Employees' Insurance Benefits Act (Ill. Rev. Stat. 1969, ch. 127, ¶ 501 *et seq.*). Pursuant to that statute, the State was required to pay 50% of the health insurance premium for qualified employees and annuitants. Ill. Rev. Stat. 1969, ch. 127, ¶ 509(c). The program of disability, retirement and survivor benefits and the program of group life and health insurance benefits were in effect when the provisions of

- 3 -

Illinois Constitution of 1970 were formulated during the Sixth Constitutional Convention and approved by the voters of Illinois.[1]

¶ 4    Effective January 1, 1972, the State Employees' Insurance Benefits Act was repealed (Pub. Act 77-476 (eff. Jan. 1, 1972)) and superseded by the Group Insurance Act, which also provided a program of group life and group health insurance to current state employees, retired state employees, and certain of their dependents (Ill. Rev. Stat. 1971, ch. 127, ¶ 522).

¶ 5    The Group Insurance Act increased the health insurance benefit that had been granted under the prior statute. Initially, it called for the State to pay the full cost "of the basic non-contributory group life insurance and group health insurance on each eligible employee and annuitant" (Ill. Rev. Stat. 1971, ch. 127, ¶ 530(a)), but that provision was later qualified. Effective July 1, 1992, the General Assembly amended the law to authorize the Director to require most members who were employees to begin contributing up to $12.50 per month for their basic group health benefits (5 ILCS 375/10(a) (West 1992)), a cap which was removed in 1995 (5 ILCS 375/10(a) (West 1996)). With respect to retired members, the 1992 amendment provided as follows:

> "The State shall pay the cost of the basic program of group health benefits only after benefits are reduced by the amount of benefits covered by Medicare for all retired members and retired dependents aged 65 or older who are entitled to benefits under Social Security or the Railroad Retirement system or who had sufficient Medicare-covered government employment ***." 5 ILCS 375/10(a) (West 1992).

The reach of this modification in annuitant benefits was prospective only, where the amendment expressly provided that:

> "such reduction in benefits shall apply only to those retired members or retired dependents who (1) first become eligible for such Medicare coverage on or after the effective date of this amendatory Act of 1992; or (2) remain eligible for, but no longer receive Medicare coverage which they had been receiving on or after the effective date of this amendatory Act of 1992." *Id.*

¶ 6    In 1997 and 1998, the General Assembly made further changes with respect to the program of group health benefits for SERS, SURS and TRS annuitants, retired members and survivors. It did so through Public Acts 90-65 (eff. July 7, 1997) and 90-582 (eff. May 27, 1998). As with the 1992 changes affecting retiree health benefits, the 1997 and 1998 legislative acts were prospective. They applied only to "new SERS, SURS and TRS annuitants," "new SURS retirees," or "new SERS, SURS and TRS survivors," a group limited to persons who first became annuitants, retired employees, or survivors under the three retirement systems on or after specified dates in 1998. Existing retirees and survivors continued to have the cost of their basic program of group health benefits paid in full by the State, subject to the Medicare-related modifications that were enacted in 1992. With respect to new SERS, SURS and TRS annuitants, retired members and their survivors, the law instituted a system under which the retired member or member's survivor would be responsible for the cost of the basic program of

---

[1] The convention convened December 8, 1969, and adjourned September 3, 1970. The provisions of the new constitution were submitted to the voters for ratification at a special election held December 15, 1970. 1 Record of Proceedings, Sixth Constitutional Convention, Introduction, vii-x.

group health benefits offered by the State, but the State would contribute toward that expense based on the length of the member's service. Specifically, the law provided that:

> "[T]he State shall contribute toward the cost of the annuitant's coverage under the basic program of group health benefits an amount equal to 5% of that cost for each year of creditable service upon which the annuitant's retirement annuity is based, up to a maximum of 100% for an annuitant with 20 or more years of creditable service." 5 ILCS 375/10(a-1) to (a-7) (West 1998).

The remainder, if any, of the cost of coverage under the basic program of group health benefits was the responsibility of the annuitant or the survivor. *Id.* The terms of these provisions were disseminated to affected state employees, annuitants and survivors through, among other things, a benefit handbook published by the Illinois Department of Central Management Services.

¶ 7 In 1998, the American Federation of State, County, and Municipal Employees, Council 31 (AFSCME), the labor union that serves as the exclusive bargaining representative for approximately 40,000 state employees, negotiated a new collective bargaining agreement with the State on behalf of its members. That agreement addressed the health insurance benefits that would be provided to former employees who had retired and to then-current employees when they retired in the future. Its substantive provisions were consistent with section 10 of the Group Insurance Act, as amended by Public Acts 90-65 and 90-582. With respect to new annuitants and their survivors, the agreement adopted the same service-based schedule of graduated premium percentages set forth in section 10. The collective bargaining agreement did not alter the State's obligations regarding annuitants who had retired prior to January 1, 1998, or their survivors. As to those individuals, the State remained obligated to pay the cost of their basic program of group health benefits in full, subject to the 1992 Medicare-related modifications, just as it was with respect to annuitants and survivors not covered by the collective bargaining agreement.

¶ 8 The collective bargaining agreement covered the period between 1997 and 2000. The same terms governing the State's obligation to pay the cost of the basic program of group health benefits for annuitants and survivors were incorporated into successive collective bargaining agreements covering the periods between 2000 and 2004, 2004 and 2008, and 2008 and 2012.

¶ 9 In 2002, the General Assembly enacted Public Act 92-566, effective June 25, 2002, which offered an early retirement incentive program for members of SERS and TRS. 40 ILCS 5/14-108.3, 16-133.3 (West 2002). This statute amended Articles 14 and 16 of the Pension Code to provide that members of these retirement systems could establish up to five years of creditable service and age enhancements. The additional creditable service and, subject to some limits, the age enhancements could be used to accelerate an employee's eligibility to receive a retirement annuity, allowing him or her to retire earlier than would otherwise have been possible. Receipt of a retirement annuity would, in turn, qualify the new annuitant to begin receiving the service-based contributions from the State toward the cost of his or her coverage under the basic program of group health benefits as specified by Public Acts 90-65 and 90-582 and, in the case of employees who belonged to AFSCME, as required by the collective bargaining agreements.

¶ 10 Participation in the statutory early retirement program was voluntary and subject to several qualifications. In exchange for obtaining the benefits provided under the law, employees were

required to file written applications and terminate their employment with the State before the end of the year. Any employee who retired early under the program could not thereafter return to state service, other than as a temporary employee, without forfeiting the age enhancement and creditable service obtained through the program. Moreover, employees who wished to obtain the age enhancement and additional creditable service had to make specified contributions that were based on each individual employee's rate of compensation and retirement contribution rate as of June 1, 2002. See 40 ILCS 5/14-108.3, 16-133.3 (West 2002).

¶ 11 Prior to the deadline for making an election to take early retirement under that program, the Department of Central Management Services and SERS distributed materials to state employees describing the law's provisions, including the impact on service credits under the applicable Pension Code provisions. That information was disseminated in various ways, including in a pamphlet and on an internet website. The SERS pamphlet stated, *inter alia*, "[o]n the effective date of your retirement, your group health, dental and life insurance continues automatically. *** If you have at least 20 years of creditable service with SERS, your health coverage is provided at no cost." The web page of the Department of Central Management Services included a section designated as "Frequently Asked Questions," which stated "[i]f you have established at least 20 years of creditable service, either by having worked 20 years or by purchasing additional creditable service time under the Early Retirement provisions ***, your health insurance coverage is provided at no cost when your pension begins." These representations accurately described the benefit eligibility rules under the governing law in effect at the time.

¶ 12 Ten years after the 2002 early retirement program was implemented, the General Assembly passed and the Governor signed into law Public Act 97-695, the legislation that is the subject of this appeal. This new law, which took effect in July of 2012, fundamentally altered the State's obligation to contribute toward the cost of coverage under the basic program of group health benefits for annuitants, retirees and survivors in SERS, SURS, and TRS. It did so by repealing the statutory provisions that, subject to the 1992 Medicare-related modifications, required the State to pay in full the cost of benefits for pre-1998 annuitants, retirees and survivors in those three systems and to make specified contributions according to the service-based graduated schedule for those who became new annuitants, retirees or survivors under those systems beginning in 1998. In place of those provisions, the General Assembly established a new system under which the amount the State will contribute toward the basic program of group health benefits on behalf of SERS, SURS and TRS annuitants, retirees and survivors is to be determined administratively, on an annual basis, by the Director of the Department of Central Management Services. 5 ILCS 375/10(a-8.5) (West 2012).

¶ 13 To facilitate the implementation of the new system, Public Act 97-695 amended the Illinois Administrative Procedure Act (5 ILCS 100/1-1 *et seq*. (West 2012)) to permit the contributions paid by "the State, annuitants, survivors, retired employees, or any combination of those entities" for group health benefits to be altered through emergency rules. 5 ILCS 100/5-45(c), (c-5) (West 2012). Rules subsequently promulgated by the Department of Central Management Services pursuant to this authority have adopted a two-part formula for calculating premiums. 80 Ill. Adm. Code 2200.510 (2013). First (with limited exception for certain SURS retirees and their survivors), annuitants, retirees and survivors must pay a portion of the cost of their group health benefits based on the same service-based graduated

schedule previously set forth in now-repealed sections of the statute for post-1998 annuitants, retirees and survivors. 80 Ill. Adm. Code 2200.530 (2013). In addition, each annuitant, survivor or retired employee with primary coverage under the State's group health insurance program must also pay an extra sum based on the total annual annuity they are receiving from any and all of the State's five retirement systems. Annuitants, survivors or retired employees with primary coverage under Medicare, and those 65 or older whose primary coverage would otherwise be under the federal Medicare health insurance program except for his or her inability to contribute to Medicare while actively working, must pay an additional premium equal to 1% of their total annual annuity. 80 Ill. Adm. Code 2200.520(b), (c) (2013). All others are required to pay an additional premium equal to 2% of their total annual annuity. 80 Ill. Adm. Code 2200.520(a) (2013).

¶ 14 Application of Public Act 97-695 and the rules promulgated thereunder is not limited to those who become annuitants or survivors on or after the statute's effective date. Unlike previous changes to the Group Insurance Act, Public Act 97-695 makes no distinction based on when a person first became an annuitant, retiree or survivor. The new two-part formula applies to existing annuitants, retirees and survivors as well as those who retire or qualify as survivors in the future. Moreover, the new law contains no exceptions for either annuitants, retirees or survivors whose health benefit costs were negotiated by AFSCME and incorporated into collective bargaining agreements or for those annuitants, retirees or survivors who elected to participate in the early retirement program offered by the State in 2002.

¶ 15 Also, Public Act 97-695 does not require that the current two-part formula be retained, nor does it impose any caps on the amount the Director may require annuitants, retirees or survivors to pay toward their health insurance. Although annuitants, retirees and survivors may waive or terminate their coverage (5 ILCS 375/10(a-8) (West 2012)), the law affords them no offsetting benefit for doing so.

¶ 16 After Public Act 97-695 took effect, four separate lawsuits were filed challenging its constitutionality and contesting the State's right to charge premiums under the new system. Bauer v. Weems, No. 12-L-35 (Cir. Ct. Randolph Co.); Kanerva v. Weems, No. 12-L-582 (Cir. Ct. Sangamon Co.); Maag v. Quinn, No. 12-L-162 (Cir. Ct. Sangamon Co.); McDonal v. Quinn, No. 12-L-987 (Cir. Ct. Madison Co.). All sought certification as class actions pursuant to section 2-801 *et seq*. of the Code of Civil Procedure (735 ILCS 5/2-801 *et seq*. (West 2012)), but none has yet been certified.

¶ 17 The named plaintiffs in the four cases include former state employees who retired and first began to receive annuities from state retirement systems after January 1, 1998, some as the result of an election to participate in the 2002 early retirement program. All of the post-1998 retirees in the Bauer v. Weems, Kanerva v. Weems, and McDonal v. Quinn cases are "new annuitants" within the meaning of Public Acts 90-65 and 90-582, and throughout their retirement, the cost of their basic program of group health benefits has been paid by the State in accordance with the service-based schedule of graduated premium percentages set forth in that statute.

¶ 18 All the named plaintiffs in the Bauer v. Weems case are current or retired union members covered by the collective bargaining agreements negotiated by AFSCME, including the provisions of those agreements requiring the State to contribute to the cost of their basic program of group health benefits under the terms described above.

- 7 -

¶ 19      The Kanerva v. Weems, Bauer v. Weems, and McDonal v. Quinn cases each name as a defendant Malcolm Weems in his capacity as Director of the Department of Central Management Services. The Department of Central Management Services is an additional defendant in the Bauer v. Weems case, while the Board of Trustees of SERS and the State Comptroller are additional defendants in the Kanerva v. Weems litigation. In the McDonal v. Quinn case, the Governor and State Treasurer are named as additional defendants. The Governor and the State Treasurer were initially the sole defendants in the Maag v. Quinn case, though plaintiffs ultimately named Weems, the Board of Trustees of SERS, and the State Comptroller as defendants in that case as well.

¶ 20      All four cases assert that the obligations under the prior law, requiring the State to make specified contributions toward the health insurance premium for annuitants and survivors in the State's retirement systems, constitute a benefit of membership in those systems within the meaning of article XIII, section 5, of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5). Plaintiffs contend that by amending the law to authorize a system under which annuitants and survivors are required to contribute additional amounts toward the cost of their health care, where those costs previously were borne by the State, Public Act 97-695 has diminished or impaired this retirement system membership benefit.

¶ 21      The plaintiffs in the Kanerva v. Weems and Bauer v. Weems cases also challenge the validity of Public Act 97-695 on additional grounds. The complaint filed in the Kanerva v. Weems action asserts that Public Act 97-695 violates the separation of powers clause in the Illinois Constitution (Ill. Const. 1970, art. II, § 1) as "an invalid delegation of legislative authority to an administrative agency or officer" because it fails to provide the Director of the Department of Central Management Services with intelligible standards by which to exercise his statutory duty to determine the level of contributions by the State and the retired members of the affected retirement systems.

¶ 22      The Kanerva v. Weems plaintiffs further claim that Public Act 97-695 violates the contracts clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 16), which provides that "[n]o ex post facto law, or law impairing the obligation of contracts *** shall be passed." The Kanerva v. Weems complaint alleges that the provisions of the prior law constituted a promise to provide health insurance coverage to retirees at no cost if they had at least 20 years of creditable service on the effective date of their retirements and that Public Act 97-695 deprived them of the benefit of the resulting contractual right in violation of article I, section 16.

¶ 23      Finally, the Kanerva v. Weems plaintiffs also assert a claim for promissory estoppel on behalf of those among them who had elected to participate in the early retirement program in 2002. As to that subset of now-retired employees, they allege that the State promised participants in that program that they would receive free health insurance if they established at least 20 years of creditable service and that the subset of plaintiffs who took early retirement reasonably and detrimentally relied on the State's promise by, among other things, retiring from state service and making cash payments to obtain the additional service credits. That subset of plaintiffs claim that, under these circumstances, the State should not be permitted to renege on its promise and should be enjoined from withholding health insurance premiums from the annuity payments owed to the early retirees.

¶ 24      The complaint in the Bauer v. Weems case also challenges Public Act 97-695 on the ground that it constitutes an impermissible impairment of contract in violation of the contracts

clause (Ill. Const. 1970, art. I, § 16). The Bauer v. Weems plaintiffs allege that the service-based schedule of graduated premium percentages, established by section 10 of the Group Insurance Act, is a form of deferred compensation and that the terms of the collective bargaining agreements, which incorporated that service-based schedule, created an enforceable contractual right to collect this deferred compensation upon their retirement. The Bauer v. Weems plaintiffs further assert that requiring contributions in excess of those required under the service-based graduated schedule, as provided in the collective bargaining agreements, constitutes a breach of contract under common-law principles, for which they are entitled to an award of damages.

¶ 25 The Kanerva v. Weems and Maag v. Quinn cases were both filed in Sangamon County. The action brought by the Bauer v. Weems plaintiffs was initiated in Randolph County. The action filed by the McDonal v. Quinn plaintiffs was brought in Madison County. After the cases were commenced, defendants filed motions, pursuant to Supreme Court Rule 384 (eff. Nov. 1, 1990), requesting that the Bauer v. Weems and McDonal v. Quinn cases be transferred to the circuit court of Sangamon County and consolidated with the Kanerva v. Weems and Maag v. Quinn cases. We granted that motion, and all four cases were subsequently litigated in the circuit court of Sangamon County.

¶ 26 Following consolidation, defendants filed a combined motion to dismiss all four complaints, challenging the sufficiency of the pleadings under section 2-615 of the Code of Civil Procedure (Code) (735 ILCS 5/2-615 (West 2012)) and seeking involuntary dismissal under section 2-619 of the Code (735 ILCS 5/2-619(a)(1) (West 2012)). See 735 ILCS 5/2-619.1 (West 2012). Defendants argued that plaintiffs failed to state a cause of action for violation of article XIII, section 5, because that provision protects only traditional pension benefits and does not encompass the State's obligations to contribute toward the cost of health care benefits for retired state employees and their survivors, which was the subject of Public Act 97-695. Defendants also asserted that plaintiffs failed to state a claim for violation of the contracts clause in article I, section 16, because state employees, retirees and survivors have no contractual right to the health care benefit subsidies that were abolished by Public 97-695. Defendants further contended that Public Act 97-695 was not subject to challenge on the ground that it constituted an impermissible delegation of legislative authority to an administrative agency or officer, where it provided the requisite clarity and guidance.

¶ 27 The portion of defendants' motion that sought involuntary dismissal under section 2-619 of the Code (735 ILCS 5/2-619 (West 2012)), was premised on the contention that under the State Lawsuit Immunity Act (745 ILCS 5/1 *et seq.* (West 2012)) the circuit court lacked jurisdiction to consider any of plaintiffs' claims except those seeking injunctive relief. Moreover, even as to those claims, the State argued that because the Governor, the Treasurer, and the Comptroller have no authority for enforcement of Public Act 97-695, the claims for injunctive relief should be dismissed as to them, and those claims should proceed, if at all, only against the Director of the Department of Central Management Services.

¶ 28 While defendants' motion to dismiss was pending, the Maag v. Quinn and McDonal v. Quinn plaintiffs requested leave to amend their complaints to add additional claims. The proposed second amended complaint in the Maag v. Quinn case added a promissory estoppel claim similar to one asserted by the Kanerva v. Weems plaintiffs. The McDonal v. Quinn plaintiffs' amended complaint sought to add claims sounding in contract and alleging that

defendants had breached a promise to current and prospective employees that the State would not charge them for medical and dental insurance for themselves and their dependents upon retirement.

¶ 29    Following briefing and argument, the circuit court entered an order on March 19, 2013, dismissing all of plaintiffs' claims on the grounds asserted in defendants' motion. After entry of that dismissal order, the named plaintiff in the Maag v. Quinn case asked the court to rule on his pending motion to amend his complaint. In response, the Kanerva v. Weems plaintiffs stated that they did not want to delay appellate review and that they opposed "another round of briefs and argument," but would not oppose a decision to "grant leave to file the amended complaints and then immediately dismiss them without briefs or argument and based on [the circuit court's] present ruling." The circuit court responded as follows:

> "It is not my intention to re-brief or re-argue the Motions to Dismiss. *** If no one objects, I will simply enter an order granting the Motion for Leave to File the Amended Complaint, note that it only raises issues that were addressed by the Motion to Dismiss, and then immediately dismiss the Amended Complaint for the reasons set forth in my March 19 Order."

The defendants advised the court that they had no objection to the suggested resolution, explaining their agreement was "[i]n light of your indication of how you intend to proceed if no party objects to the *** motions to file amended complaints ***, as well as the lack of any objection by any of the plaintiffs' counsel (including in Maag v. Quinn and McDonal v. Quinn) to that manner of proceeding." Counsel in the Maag v. Quinn case also responded that his client had no objection to the suggested procedure, but did not waive objections to the dismissal of that case.

¶ 30    On March 21, 2013, the circuit court entered a "corrected order" that granted the Maag v. Quinn and McDonal v. Quinn plaintiffs leave to file amended complaints and dismissed those complaints for the reasons set forth in its March 19, 2013 order. The order further stated that the circuit court had "considered the Motions to Dismiss in regards to the Amended Complaints" and that "[t]here is no reason to delay the enforcement or appeal of this Order." This appeal followed.

¶ 31                                    ANALYSIS

¶ 32    The central issue in this appeal, which is common to all four cases before us, is whether the circuit court erred in dismissing plaintiffs' claims that Public Act 97-695 violates the pension protection clause of the Illinois Constitution of 1970 (Ill. Const. 1970, art. XIII, § 5). Those claims were challenged by defendants and dismissed by the circuit court under section 2-615 of the Code (735 ILCS 5/2-615 (West 2012)).

¶ 33    A motion to dismiss under section 2-615 challenges the legal sufficiency of a complaint. *Bonhomme v. St. James*, 2012 IL 112393, ¶ 34. In ruling on such a motion, a court must accept as true all well-pleaded facts in the complaint, as well as any reasonable inferences that may arise from them. *Id.* The critical inquiry is whether the allegations of the complaint, when construed in the light most favorable to the plaintiff, are sufficient to establish a cause of action upon which relief may be granted. *Id.* A cause of action should not be dismissed under section 2-615 unless it is clearly apparent from the pleadings that no set of facts can be proven that would entitle the plaintiff to recover. *Khan v. Deutsche Bank AG*, 2012 IL 112219, ¶ 47. Our

review of an order granting a section 2-615 motion to dismiss is *de novo* (*id.*), as is our review of a determination as to the constitutionality of a statute (*Cwik v. Giannoulias*, 237 Ill. 2d 409, 416 (2010)).

¶ 34    Statutes are presumed to be constitutional, and the party challenging the validity of a statute bears the burden of rebutting this presumption. *Hope Clinic for Women, Ltd. v. Flores*, 2013 IL 112673, ¶ 33. In addition, this court has a duty to construe a statute in a manner that upholds its validity and constitutionality if such a construction is reasonably possible. *Cwik*, 237 Ill. 2d at 416.

¶ 35    The question of whether the pension protection clause applies to an Illinois public employer's obligation to contribute to the cost of health care benefits for employees covered by one of the state retirement systems presents an issue of first impression in this court.[2] Resolution of this issue requires that we determine the scope of the protections afforded by article XIII, section 5, which presents a question of constitutional interpretation.

¶ 36    The construction of constitutional provisions is governed by the same general principles that apply to statutes. *People ex rel. Chicago Bar Ass'n v. State Board of Elections*, 136 Ill. 2d 513, 526-27 (1990). Our objective when construing a constitutional provision is to determine and effectuate the common understanding of the citizens who adopted it (*Committee for Educational Rights v. Edgar*, 174 Ill. 2d 1, 13 (1996)), and courts will look to the natural and popular meaning of the language used as it was understood when the constitution was adopted (*Hamer v. Board of Education of School District No. 109*, 47 Ill. 2d 480, 486 (1970)). Where the language of a constitutional provision is unambiguous, it will be given effect without resort to other aids for construction. *Graham v. Illinois State Toll Highway Authority*, 182 Ill. 2d 287, 301 (1998). In addition, it is proper to consider constitutional language "in light of the history and condition of the times, and the particular problem which the convention sought to address ***." *Client Follow-Up Co. v. Hynes*, 75 Ill. 2d 208, 216 (1979). "Moreover, *** to the extent there is any question as to legislative intent and the clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioner." *Prazen v. Schoop*, 2013 IL 115035, ¶ 39; accord *Shields v. Judges' Retirement System*, 204 Ill. 2d 488, 494 (2003); *Matsuda v. Cook County Employees' & Officers' Annuity & Benefit Fund*, 178 Ill. 2d 360, 365-66 (1997).

¶ 37    In this case, plaintiffs contend that, by eliminating the statutory standards in the prior version of section 10 of the Group Insurance Act and requiring annuitants and survivors to contribute additional amounts toward the cost of their health care, Public Act 97-695 has diminished or impaired this retirement system membership benefit, in violation of the pension protection clause. Defendants respond by asserting that State contributions to retiree health insurance premiums, which are not codified in the Pension Code and are not paid from the assets of the retirement funds established in the Pension Code, are fundamentally different from pension annuities and, therefore, are not included within the protections afforded by article XIII, section 5.

---

[2]Two trial courts have addressed this issue and reached divergent conclusions. See Marconi v. City of Joliet, No. 10-MR-165 (Cir. Ct. Will Co. July 21, 2011), *rev'd and remanded on other grounds*, 2013 IL App (3d) 110865; *Underwood v. City of Chicago*, No. 13 C 5687, 2013 WL 6578777, at *5-11 (N.D. Ill. Dec. 13, 2013).

¶ 38    Article XIII, section 5, provides that "[m]embership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5. Under the language of this provision, which was based on a nearly identical provision of the New York constitution (see *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 163 (1985); *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833, 845 (1979)), it is clear that if something qualifies as a benefit of the enforceable contractual relationship resulting from membership in one of the State's pension or retirement systems, it cannot be diminished or impaired. Thus, the question presented is whether a health insurance subsidy provided in retirement qualifies as a benefit of membership.

¶ 39    As noted above, Illinois law affords most state employees a package of benefits in addition to the wages they are paid. These include subsidized health care, disability and life insurance coverage, eligibility to receive a retirement annuity and survivor benefits. These benefits were provided when article XIII, section 5, was proposed to Illinois voters for approval, as they are now.

¶ 40    Although some of the benefits are governed by a group health insurance statute and others are covered by the Pension Code, eligibility for all of the benefits is limited to, conditioned on, and flows directly from membership in one of the State's various public pension systems. Giving the language of article XIII, section 5, its plain and ordinary meaning, all of these benefits, including subsidized health care, must be considered to be benefits of membership in a pension or retirement system of the State and, therefore, within that provision's protections. See *Duncan v. Retired Public Employees of Alaska, Inc.*, 71 P.3d 882, 887 (Alaska 2003) (giving comparable provision of Alaska constitution "its natural and ordinary meaning," there "is little question" that it encompasses "health insurance benefits offered to public employee retirees").

¶ 41    No principle of statutory construction supports a contrary view. Defendants contend that the reach of article XIII, section 5, is confined to the retirement annuity payments authorized by the Pension Code, but there is nothing in the text of the constitution that warrants such a limitation. Just as the legislature is presumed to act with full knowledge of all prior legislation (*People v. Jones*, 214 Ill. 2d 187, 199 (2005)), the drafters of a constitutional provision are presumed to know about existing laws and constitutional provisions and to have drafted their provision accordingly (see 16 Am. Jur. 2d *Constitutional Law* § 35 (2009); *Plymouth Township v. Wayne County Board of Commissioners*, 359 N.W.2d 547, 552 (Mich. App. 1984). If they had intended to protect only core pension annuity benefits and to exclude the various other benefits state employees were and are entitled to receive as a result of membership in the State's pensions systems, the drafters could have so specified. But they did not. The text of the provision proposed to and adopted by the voters of this State did not limit its terms to annuities, or to benefits conferred directly by the Pension Code, which would also include disability coverage and survivor benefits. Rather, the drafters chose expansive language that goes beyond annuities and the terms of the Pension Code, defining the range of protected benefits broadly to encompass those attendant to membership in the State's retirement systems. Then, as now, subsidized health care was one of those benefits. For us to hold that such benefits are not among the benefits of membership protected by the constitution would require us to construe article XIII, section 5, in a way that the plain language of the provision does not support. We may not rewrite the pension protection clause to include

- 12 -

restrictions and limitations that the drafters did not express and the citizens of Illinois did not approve. See *Prazen*, 2013 IL 115035, ¶¶ 37-38.

¶ 42 Defendants contend that their position is supported by the debates at the constitutional convention preceding the adoption of article XIII, section 5. This contention is unpersuasive. When construing and applying article XIII, section 5, in the past, we have considered the history underlying that provision and the convention debates preceding its adoption. See *McNamee v. State of Illinois*, 173 Ill. 2d 433, 439 (1996); *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 102 (1987); *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 160-63 (1985); *Peters v. City of Springfield*, 57 Ill. 2d 142, 150-52 (1974). Yet, none of those cases involved the question of whether certain benefits attendant to membership in a state retirement system are covered by the protections guaranteed by article XIII, section 5. Because we find that this issue can be decided based on the plain language of the provision, "the debates can have little or no bearing or effect" with respect to how we construe that language. *People ex rel. Watseka Telephone Co. v. Emmerson*, 302 Ill. 300, 311 (1922).

¶ 43 Even if reference to the convention debates were appropriate, it would not aid the State's position. Section 5 of article XIII had no antecedent in the prior constitution and was not included in the report of any committee of the Sixth Constitutional Convention, where the provisions of the Constitution of 1970 were formulated. It was proposed on the floor of that convention for the first time without a formal hearing, and there is no committee report to aid in its interpretation. See *Peters v. City of Springfield*, 57 Ill. 2d 142, 150-51 (1974); ILCS Ann., 1970 Const., art. XIII, § 5, Constitutional Commentary, at 665 (Smith-Hurd 2006).

¶ 44 The floor debates on the new provision have previously been characterized by the courts as "confused" (*Kraus*, 72 Ill. App. 3d at 843) and reflecting "uncertainty as to the scope of the restriction which the section imposed on legislative bodies" (*Peters v. City of Springfield*, 57 Ill. 2d 142, 151 (1974)). Accordingly, we must be circumspect in attempting to draw conclusions based on what was said during the course of the debates.

¶ 45 Some insight is provided by the context in which the provision which ultimately became article XIII, section 5, was proposed to the constitutional convention. At the time of the convention, Illinois adhered to the traditional classification of pension plans as either mandatory or optional. Where an employee's participation in a pension plan was mandatory, the rights created in the relationship were considered to be in the nature of a gratuity that could be revoked at will. Where the employee's participation in a pension plan was optional, the pension was considered enforceable under contract principles. This distinction created uncertainty regarding the enforceability of pension rights, a concern exacerbated by the proposed creation of broad home rule powers for municipalities, which some delegates to the convention feared could lead municipalities into debt and result in their abandoning their pension obligations to public employees, including police officers and firefighters. *McNamee*, 173 Ill. 2d at 440. Delegates were also mindful that in the past, appropriations to cover state pension obligations had "been made a political football" and "the party in power would just use the amount of the state contribution to help balance budgets," jeopardizing the resources available to meet the State's obligations to participants in its pension systems in the future. 4 Record of Proceedings, Sixth Illinois Constitutional Convention 2930-31 (statements of Delegate Bottino).

¶ 46    Delegate Green, who first proposed the provision which became article XIII, section 5, began his presentation to the convention by stating that it does two things: "[i]t first mandates a contractual relationship between the employer and the employee; and secondly, it mandates the General Assembly not to impair or diminish these rights." 4 Record of Proceedings 2925 (statements of Delegate Green). It does so, he explained, in order to protect "public employees who are beginning to lose faith in the ability of the state and its political subdivisions to meet these benefit payments" and to address the "insecurity on the part of the public employees [which] is really defeating the very purpose for which the retirement system was established ***." *Id.* Delegate Kemp, who spoke in support of the measure, viewed its purpose as "mak[ing] certain that irrespective of the financial condition of a municipality or even the state government, that those persons who have worked for often substandard wages over a long period of time could at least expect to live in some kind of dignity during their golden years ***." *Id.* at 2926 (statements of Delegate Kemp). In subsequent comments, other delegates reaffirmed that the provision was designed to confer contractual protection on pension benefits (see, *e.g.*, *id.* at 2929-30 (statements of Delegate Whalen)) and give beneficiaries, pensioners or their dependents "a basic protection against abolishing their rights completely or changing the terms of their rights after they have embarked upon the employment—to lessen them" (*id.* at 2929 (statements of Delegate Kinney)).

¶ 47    When asked for a summation, Delegate Green stated:

"What we are trying to do is to mandate the General Assembly to do what they have not done by statute. ***

    Now, I think they either ought to live up to the laws that they pass or that very quickly we ought to stop when we are hiring public employees by telling them that they have any retirement rights in the state of Illinois. If we are going to tell a policeman or a school teacher that, 'Yes, if you will work for us for your thirty years or until whenever you reach retirement age, that you will receive this,' if the state of Illinois and its municipalities are going to play insurance company and live up to these contributions, then they ought to live by their own rules. And this is all in the world this mandate is doing." *Id.* at 2931 (statements of Delegate Green).

¶ 48    The foregoing remarks demonstrate that article XIII, section 5, was intended to eliminate the uncertainty that existed under the traditional classification of retirement systems and to guarantee that retirement rights enjoyed by public employees would be afforded contractual status and insulated from diminishment or impairment by the General Assembly. In light of the constitutional debates, we have concluded that the provision was aimed at protecting the right to receive the promised retirement benefits, not the adequacy of the funding to pay for them. *People ex rel. Sklodowski v. State of Illinois*, 182 Ill. 2d 220, 232 (1998); *McNamee*, 173 Ill. 2d at 446. To infer more, however, would require more than the reports of the floor debate reasonably support. While there was some discussion regarding how the provision would work in practice, the specific issue of health care benefits received by state annuitants under the predecessor provision to the Group Insurance Act was not raised or addressed, and nothing in the debates evinces an intention to treat annuitant health care benefits differently from the other benefits of pension and retirement system membership then in effect.

¶ 49    Our conclusion that health insurance subsidies are constitutionally protected by the pension protection clause is supported by the recent decision in *Everson v. State of Hawai'i*,

228 P.3d 282 (Haw. 2010), which addressed the reach of a provision in the Hawaii state constitution that is similar to article XIII, section 5, and shares the same origin. That provision states that "[m]embership in any employees' retirement system of the State or any political subdivision thereof shall be a contractual relationship, the accrued benefits of which shall not be diminished or impaired." Haw. Const., art. XVI, § 2. Like Illinois, Hawaii state law confers on public employees a package of benefits which includes both health insurance and eligibility for retirement annuities. *Everson*, 228 P.3d at 288, 292-93. As in Illinois, health coverage is addressed in a separate statute from the law governing retirement annuities, but eligibility for health care coverage following retirement is conditioned on membership in one of specified public retirement systems. *Id*. at 294. When a challenge was raised to the validity of a statutory change affecting health care benefits for retired public employees, the Supreme Court of Hawaii concluded, as we have, that because the health care benefits arise from and are conditioned on membership in a public retirement system, they qualify as a benefit of membership in the retirement system and fall within the protections of Hawaii's constitutional counterpart to article XIII, section 5. *Id*. at 295-97.

¶ 50    In urging a contrary result, defendants place significant reliance on an earlier opinion by the New York Court of Appeals, that state's highest court of review, in *In re Lippman*, 487 N.E.2d 897 (N.Y. 1985). At issue in *Lippman* was a decision by a local school board to substantially reduce the amount it would contribute toward the health care premiums for its retired employees and their dependents by lowering those contributions to the minimum amounts permitted by state law. That decision was challenged on the grounds that it violated article V, section 7 of New York's constitution, which was the model for article XIII, section 5 of our constitution, and provided that "[a]fter July first, nineteen hundred forty, membership in any pension or retirement system of the state or of a civil division thereof shall be a contractual relationship, the benefits of which shall not be diminished or impaired." *Id*. at 899.

¶ 51    The New York Court of Appeals rejected the challenge and held that the protections afforded by article V, section 7, extended only to benefits directly related to the terms of the retirement annuity, that retired employees receive subsidies for health insurance premiums "not as a benefit of membership in the retirement system but because he or she was an employee of the State of New York or participating employer," and that the premium increase involved was within the amounts permitted by state statute. *Id*. at 899-900.

¶ 52    The Supreme Court of Hawaii found the New York high court's ruling distinguishable and unpersuasive. *Everson*, 228 P.3d at 297-98. We agree. As set forth above, when article XIII, section 5, was proposed, the benefits afforded state employees included subsidized health care both while they were working and after they retired, life insurance, eligibility for a retirement annuity, disability coverage and survivor benefits. Because an employee's eligibility for subsidized health care following retirement, as well as his or her eligibility for an annuity, disability coverage and survivor benefits, is conditioned on membership in one of the State's various public pension systems, all of the benefits that flow from that relationship are constitutionally protected under article XIII, section 5.

¶ 53    There is nothing in the text of article XIII, section 5, its history, or the convention debates that would support a conclusion that only the retirement annuity itself falls within the provision's protections. For the reasons previously discussed, the other benefits, including subsidized health care, are also properly regarded as benefits of membership in the public

pensions systems and therefore likewise protected. Moreover, unlike the action challenged in the *Lippman* case, enactment of Public Act 97-695 did not involve a mere increase in contribution levels within boundaries authorized by existing state law. In this case, the fixed standards established under the existing law were eliminated completely once Public Act 97-695 took effect.

¶ 54    Defendants observe that health care costs and benefits are governed by a different set of calculations than retirement annuities. While that is unquestionably true, it is also legally irrelevant. The criterion selected by the drafters and approved by the voters is status based. Whether a benefit qualifies for protection under article XIII, section 5, turns simply on whether it is derived from membership in one of the State's public pension systems. If it qualifies as a benefit of membership, it is protected. If it does not, it is not. How the benefit is actually computed plays no role in the inquiry.

¶ 55    Finally, we point out again a fundamental principle noted at the outset of our discussion. Under settled Illinois law, where there is any question as to legislative intent and the clarity of the language of a pension statute, it must be liberally construed in favor of the rights of the pensioner. This rule of construction applies with equal force to our interpretation of the pension protection provisions set forth in article XIII, section 5. Accordingly, to the extent that there may be any remaining doubt regarding the meaning or effect of those provisions, we are obliged to resolve that doubt in favor of the members of the State's public retirement systems.

¶ 56                                          CONCLUSION

¶ 57    For the foregoing reasons, we conclude that the State's provision of health insurance premium subsidies for retirees is a benefit of membership in a pension or retirement system within the meaning of article XIII, section 5, of the Illinois Constitution, and the General Assembly was precluded from diminishing or impairing that benefit for those employees, annuitants, and survivors whose rights were governed by the version of section 10 of the Group Insurance Act that was in effect prior to the enactment of Public Act 97-695. Accordingly, the circuit court erred in dismissing plaintiffs' claims that Public Act 97-695 is void and unenforceable under article XIII, section 5.

¶ 58    Our holding that plaintiffs are entitled to proceed on their pension protection clause claims obviates the need to address the sufficiency of their remaining claims. Because plaintiffs have obtained all the relief that they seek, any comment on their other claims would be advisory and in conflict with traditional principles of judicial restraint. See *In re Alfred H.H.*, 233 Ill. 2d 345, 351 (2009) (recognizing that Illinois courts generally do not consider issues where the outcome will not be affected, regardless of how those issues are decided).

¶ 59    The judgment of the circuit court of Sangamon County is reversed, and the cause is remanded for further proceedings.

¶ 60    Circuit court judgment reversed.

¶ 61    Cause remanded.

¶ 62    JUSTICE BURKE, dissenting:

¶ 63    I disagree with the majority's holding that the pension protection clause protects more than pensions. I also disagree with the majority's disposition of this case, which is unclear. I

- 16 -

therefore respectfully dissent.

¶ 64                               Pension Protection Clause

¶ 65     The primary issue presented in this case is the scope of article XIII, section 5, of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5). That provision, which is titled "Pension and Retirement Rights," is commonly referred to as the pension protection clause. The clause provides: "Membership in any pension or retirement system of the State *** shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

¶ 66     The meaning of a constitutional provision depends on the common understanding of the citizens who adopted it. *League of Women Voters of Peoria v. County of Peoria*, 121 Ill. 2d 236, 243 (1987); *Kalodimos v. Village of Morton Grove*, 103 Ill. 2d 483, 492-93 (1984). To determine that understanding, courts look first to the plain and generally understood meaning of the words used in the provision. *League of Women Voters of Peoria*, 121 Ill. 2d at 243; *Kalodimos*, 103 Ill. 2d at 493. If doubt remains after the language of the provision has been considered, it is appropriate to consult the debates of the constitutional convention to ascertain the meaning that the delegates attached to the provision since it is only with the consent of the convention that such provisions are submitted to the voters in the first instance. *League of Women Voters of Peoria*, 121 Ill. 2d at 243-44; *Kalodimos*, 103 Ill. 2d at 493.

¶ 67     As its title states, the pension protection clause protects "pension and retirement rights." Commonly understood, a pension or retirement system is a plan or fund that provides retirement income to employees. As the United States Supreme Court has stated, the "ordinary meaning" of a pension is " 'a fixed sum ... paid under given conditions to a person following his retirement from service (as due to age or disability) or to the surviving dependents of a person entitled to such a pension.' " *Rousey v. Jacoway*, 544 U.S. 320, 330 (2005) (quoting Webster's Third New International Dictionary 1671 (1981)); see also, *e.g.*, *In re Marriage of David*, 367 Ill. App. 3d 908, 914 (2006) ("The term 'pension' means '[r]etirement benefit paid regularly (normally, monthly), with the amount of such based generally on length of employment and amount of wages or salary of pensioner.' " (quoting Black's Law Dictionary 1134 (6th ed. 1990))).

¶ 68     More specifically, this court has held that the pension protection clause does two things. First, it makes "[m]embership in any pension or retirement system of the State" an "enforceable contractual relationship." (Internal quotation marks omitted.) *People ex rel. Sklodowski v. State of Illinois*, 182 Ill. 2d 220, 228-29 (1998). This contractual relationship, we have explained, "is governed by the actual terms of the Pension Code at the time the employee becomes a member of the pension system." *Id*. at 229. Second, the clause provides that the benefits of the contractual relationship "governed by the actual terms of the Pension Code" shall not be "diminished or impaired." (Internal quotation marks omitted.) *Id*. Stated otherwise, by its plain language, the pension protection clause prohibits legislative action that diminishes or impairs pension benefits by altering the terms of the contract governing the pension.

¶ 69     In this case, plaintiffs contend that the schedule of subsidized health insurance premiums provided under the former version of section 10 of the State Employees Group Insurance Act of 1971 (5 ILCS 375/10 (West 2012)), are benefits protected from impairment or

diminishment under the pension protection clause. Plaintiffs further contend that Public Act 97-695 (eff. July 1, 2012), which eliminated the statutory schedule under the Group Insurance Act, impaired or diminished those benefits and, therefore, violated the pension protection clause.

¶ 70    It is clear, however, that the subsidized health insurance premiums provided under the Group Insurance Act are not pension benefits. Health insurance premiums under the Group Insurance Act are not provided by any state pension or retirement system and, thus, cannot constitute a contractual relationship "governed by the actual terms of the Pension Code" (*Sklodowski*, 182 Ill. 2d at 229). Moreover, as the circuit court below observed, pension benefits differ substantially from subsidized health insurance premiums. Pension benefits are provided to retirees in the form of a fixed income. They are paid from protected pension funds and the amount of the benefit is fixed at the time of retirement based on a formula that considers, among other things, the length of the retiree's service and salary during employment. See, *e.g.*, *Rousey*, 544 U.S. at 330. The cost of subsidized health care premiums, on the other hand, is variable and cannot be predicted using the actuarial analysis employed in pension calculations. Unlike fixed pension distributions, health care costs are not within the control of the legislature and are subject to change depending on advancements in medical technology, increases in the costs of treatments, and the availability of insurance plans offered by insurance providers. State-subsidized health insurance premiums are benefits, and may, in certain circumstances, be entitled to legal protection. They are not, however, in the plain and ordinary meaning of the word, "pension" benefits.

¶ 71    The majority concludes, however, that the schedule of subsidized health insurance premiums provided under the former section 10 of the Group Insurance Act is protected under the pension protection clause. In so holding, the majority reads the clause as stating that "something" qualifies as a constitutionally protected benefit if it "result[s] from" (*supra* ¶ 38), is "conditioned on" (*supra* ¶ 40), "flows directly from" (*supra* ¶ 40), or is "attendant to" (*supra* ¶ 41), membership in one of the State's pension or retirement systems. Thus, according to the majority, because the health care subsidies under the Group Insurance Act were provided to members of the retirement system, those benefits "flowed from" membership and are an enforceable contractual right under the pension protection clause. I disagree.

¶ 72    To reach its result, the majority must read into the pension protection clause language that is not there. Nowhere in the clause does it state that every benefit which "results from," is "conditioned on," "flows directly from" or "is attendant to" being a member of a pension system is provided constitutional protection. These phrases, which form the crux of the majority's opinion, are simply crafted out of whole cloth. It is fundamental that the judiciary may not add language to a constitutional provision that was not approved by the voters of this state. To do so is to usurp the sovereign power of the people. The majority's addition of language to the clause is error.

¶ 73    Moreover, by adding language to the pension protection clause, the majority fundamentally changes its meaning. The clause no longer protects the statutory benefits provided by a pension or retirement system. Instead, it provides constitutional protection to any statutory benefit—however unrelated to pensions—if the recipient of the benefit is a member of a pension system. And the majority provides no limit to this holding. Should the city of Springfield enact an ordinance which states that the members of the municipal pension

system will receive an honorary plaque upon retirement, that benefit would "flow from" or be "conditioned on" membership in the system. The plaque, under the majority's reasoning, would be a constitutionally protected contractual right that could not be diminished or impaired. I do not think this is what the drafters of the pension protection clause intended.

¶ 74 Unsurprisingly, nothing in the constitutional debate regarding the pension protection clause supports the majority's reading of the provision. As the majority candidly acknowledges, the constitutional debate contains no references to health insurance premiums or other non-pension benefits for retirees. To the contrary, the unambiguous statements of the sponsoring delegates reflect that it was designed to protect a public retiree's right to collect postretirement income in the form of an annuity and to ensure that the terms under which an employee acquired that right could not be altered to his or her detriment. Delegate Kinney, who sponsored the proposed pension protection clause, described the scope of the benefits protected under the provision:

> "*Benefits not being diminished really refers to this situation*: If a police officer accepted employment under a provision where he was entitled to retire at two-thirds of his salary after twenty years of service, that could not subsequently be changed to say he was entitled to only one-third of his salary after thirty years of service, or perhaps entitled to nothing. ***
>
> ***
>
> *** It is simply to give [beneficiaries] a basic protection against abolishing their rights completely or changing the terms of their rights after they have embarked upon the employment—to lessen them." (Emphasis added.) 4 Proceedings 2929 (statements of Delegate Kinney).

No comment from any delegate suggests anything to contradict this understanding.

¶ 75 Nor can it reasonably be suggested that the delegates' silence regarding health insurance benefits supports the majority's reading of the clause. At the time of the drafting of the 1970 Constitution, all of the provisions of the Pension Code pertained to the benefits provided by a pension or retirement system, that is, a fixed retirement income. No provisions addressed, or related to, subsidized health care premiums or any other non-pension benefits. It is unreasonable to assume that the delegates had health care benefits in mind when discussing the protection of pension rights when no such benefits were provided for in any pension or retirement system then in existence. It is, however, reasonable to assume that something as financially significant as subsidies for health insurance premiums, which cost the State many millions of dollars, would have been mentioned at least once during the constitutional debate, even if only in passing. They were not. In short, then, there is no support in the constitutional debate for the majority's reading of the pension protection clause.

¶ 76 Nor is there any support in our case law. As this court has stated, the contractual relationship protected by the pension protection clause is the relationship which "is governed by the actual terms of the Pension Code at the time the employee becomes a member of the pension system." *Sklodowski*, 182 Ill. 2d at 229 (citing *Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988), and *Kerner v. State Employees' Retirement System*, 72 Ill. 2d 507, 514 (1978)). The subsidized insurance premiums at issue here are not part of any pension or retirement system and, thus, cannot constitute a contractual relationship governed by the terms of the Pension

Code. Further, this court has repeatedly observed that the pension protection clause protects not health benefits or other non-pension benefits, but the public employees' contractual rights to "receive *the money* due them at the time of their retirement." (Emphasis added.) *People ex rel. Illinois Federation of Teachers v. Lindberg*, 60 Ill. 2d 266, 271 (1975); see also *Sklodowski*, 182 Ill. 2d at 230 (same); *McNamee*, 173 Ill. 2d at 444 (same). At no time has this court suggested that the pension protection clause protects any and all statutory benefits received by a person who is a member of a pension system.

¶ 77    Relevant case law from other jurisdictions also fails to support the majority's reading of the clause. Illinois courts have repeatedly looked to New York decisions in determining the scope of the protection granted under the pension protection clause since the clause was patterned on a similar provision in the New York constitution. See, *e.g.*, *Buddell v. Board of Trustees, State University Retirement System*, 118 Ill. 2d 99, 106-07 (1987); *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 163-64 (1985). In *In re Lippman*, 487 N.E.2d 897 (N.Y. 1985), the New York Civil Service Law authorized a system of health insurance benefits for public employees and retirees. *Id.* at 898. Pursuant to that statute, each participating employer was required to pay no less than 50% of the cost of premiums for employees, and 35% for their dependents, but state employers were authorized to provide greater contributions at their discretion. *Id.* The statute further provided that any employee or retiree contributions toward individual or dependent coverage were to be deducted from salary payments or retirement allowance as the case may be. *Id.*

¶ 78    In accordance with the terms of the statute, a board of education adopted a resolution providing for its payment of 100% of the health insurance premiums for its retired employees, as well as for 50% of the premiums for retirees' dependents. *Id.* Subsequently, the board of education adopted a new resolution that reduced its level of contributions to the statutory minimums of 50% of the health insurance premium for retirees and 35% of the premium for dependents. *Id.* The reduction in premium contributions was challenged as a violation of the New York constitution's pension protection clause, which is virtually identical to that of Illinois. *Id.*

¶ 79    The *Lippman* court held that the reduction did not offend the pension protection clause because the insurance premium payments did not constitute "retirement benefits" within the meaning of the constitutional provision. *Id.* at 899. In reaching this conclusion, the court noted that the relevant statute did not establish a direct relationship between the insurance coverage and retirement benefits, stating that "the only relation between health benefits and retirement benefits is the purely incidental one that the latter provides the means by which the former is paid." *Id.* at 900. The *Lippman* court concluded that "more than an incidental relationship to the retirement system must be found before an employee benefit will be held to be within the area of action prohibited by the Constitution." *Id.* at 899.

¶ 80    In addition, the court observed that previous cases finding violations of the pension protection clause all involved changes that were "directly related to the retirement benefit." (Emphasis omitted.) *Id.* (citing, *inter alia*, *Kleinfeldt v. New York City Employees' Retirement System*, 324 N.E.2d 865, 868 (N.Y. 1975) (holding that a limitation on the rate of compensation, which "is the most significant part of the formula" for determining retirement benefits, was constitutionally prohibited)); *Birnbaum v. New York State Teachers Retirement System*, 152 N.E.2d 241, 245 (N.Y. 1958) (invalidating a change in mortality tables that

directly affected the calculation of retirement annuities and observing that "it is the money payments [received] from either a pension or retirement system that is the principal if not the sole benefit the system affords"). The *Lippman* court further reasoned that the health coverage at issue was an employment benefit, not a retirement benefit, because the relevant statutory provision was not contained in the pension statute, but was set forth in a separate statute, which provided health benefits "not only to retired employees but also to employees still in service." *Lippman*, 487 N.E.2d at 900. Finally, the court observed that nothing in the statutory language indicated that employers were precluded from reducing contributions to the statutory minimum after that level had once been exceeded, or that the separately enacted provisions of the health insurance statute were intended to be a retirement benefit within the meaning of the constitutional provision. *Id.*

¶ 81 The primary factors that guided the *Lippman* court are also present in this case. The provision of health insurance premium subsidies is set forth in the Group Insurance Act, not in the Pension Code. Also, as with the New York law involved in *Lippman*, any contribution toward health insurance premiums that must be paid by a retiree is to be deducted from the individual's retirement annuity. In addition, the statements made by the delegates during the convention debate do not indicate an intent to protect other benefits that are unrelated to postretirement income. *Lippman* is thus squarely on point and persuasive.

¶ 82 Seeking to avoid the logic of *Lippman*, the majority relies on *Everson v. State of Hawai'i*, 228 P.3d 282 (Haw. 2010), and *Duncan v. Retired Public Employees of Alaska, Inc.*, 71 P.3d 882 (Alaska 2003), in which the supreme courts of Alaska and Hawaii held that provisions in their constitutions applied to state-subsidized health insurance provided to retired public employees. These cases are not persuasive.

¶ 83 *Duncan* is distinguishable on its facts. In that case, the Alaska Supreme Court held that health insurance benefits for retired public employees were constitutionally protected, as rights of membership in a public pension system. *Duncan*, 71 P.3d at 888. Underlying this ruling was the determination that retiree health benefits, which were granted by the same statute that governed public pensions, constituted a component of an employee's "retirement benefit package," which becomes part of the employment agreement at the time the employee is hired. *Id.* at 887-88. Thus, the court concluded that "whatever benefits might be provided by state retirement systems" were meant to be constitutionally protected. *Id.* at 887. The *Duncan* court distinguished *Lippman* on the ground that it "involved a medical plan that was separate from the state retirement system," and "Alaska's retirement system includes a system of retirement benefits that include more than just a pension." *Id.* at 894. The decision in *Duncan* does not govern the present case. Here, the Group Insurance Act is entirely separate from the Pension Code, which is similar to the statutory structure of New York. Also, there is no language in the Group Insurance Act or the constitutional debates evincing an intent to include statutory health insurance benefits among the benefits of membership in a pension or retirement system.

¶ 84 In *Everson*, the Hawaii Supreme Court held that statutory health insurance benefits for retired public employees were protected by a provision in Hawaii's constitution that is similar to our pension protection clause. *Everson*, 228 P.3d at 295-96. Although the retiree health benefits at issue were provided for, paid and administered outside the pension system, the court concluded that Hawaii's constitutional provision applied to all statutory benefits "derived from," "arising from," or "conditioned" on the status of "membership" in a public retirement

system. *Id.* at 295-98. In so holding, the *Everson* court specifically noted and relied upon the comments of the constitutional delegates indicating that they intended to protect any additional benefits granted by the legislature in the future that derive from such membership. *Id.* at 295-96. The court concluded that the Hawaii legislature did, after the adoption of the constitution, change the system and that it did so "to prevent a diminishment of existing health benefits for public employees and retirees." (Internal quotation marks omitted.) *Id.* at 296-97.

¶ 85     Unlike Hawaii, nothing in our constitutional debate indicates that the framers of the 1970 Constitution authorized the General Assembly to extend constitutional protection to any additional non-pension benefits at some time in the future. Moreover, the reasoning employed by the Hawaii Supreme Court is contrary to our long-standing interpretation of Illinois's pension protection clause as protecting postretirement income.

¶ 86     In addition, defendants correctly point out that acceptance of the view adopted by the Hawaii Supreme Court in *Everson* disregards the fundamental difference between pensions and health insurance. As was suggested by the concurring opinion in *Everson*, the court's holding, taken to its logical conclusion, would afford constitutional protection to the "array of health plan services most advantageous to the employee during his or her service," which could never be changed. See *Everson*, 228 P.3d at 303 (Acoba, J., specially concurring). Yet, a health benefit package cannot be fixed at its "most advantageous" level. Flexibility is necessary in the provision of health benefits, which are "subject to fluctuating and unpredictable variables." *Moore v. Metropolitan Life Insurance Co.*, 856 F.2d 488, 492 (2d Cir. 1988). Therefore, "medical insurance must take account of inflation, changes in medical practice and technology, and increases in the costs of treatment independent of inflation. These unstable variables prevent accurate prediction of future needs and costs." *Id.*

¶ 87     In sum, neither the plain language of the pension protection clause, the constitutional debate, our own case law, or case law from other jurisdictions supports the majority's position. The pension protection clause protects pensions, not subsidized health care premiums.The fact that the General Assembly has the power to grant retirees supplemental benefits, in addition to pension annuities, does not mean that those additional benefits are constitutionally protected and cannot be modified or reduced by future legislation. As defendants have acknowledged, the legislature has the ability to ensure that such additional benefits fall within the pension protection clause, but it must do so explicitly. The legislature could have expressly mandated that the provision of state-funded premium subsidies, pursuant to the graduated schedule, constitutes a contract right and is protected by the constitution, but it did not do so. In fact, the legislature has repeatedly modified the terms of the benefits provided under the Group Insurance Act, including reducing them on multiple occasions.

¶ 88     For the foregoing reasons, I would hold that the statutory provision of health insurance premium subsidies is not a benefit of membership in a pension or retirement system. Accordingly, the circuit court did not err in dismissing the plaintiffs' claims based on the pension protection clause in article XIII, section 5, of the Illinois Constitution.

¶ 89                          The Majority's Disposition of This Case

¶ 90     The majority holds that "the State's provision of health insurance premium subsidies for retirees is a benefit of membership in a pension or retirement system within the meaning of article XIII, section 5, of the Illinois Constitution" and, as a result, these subsidies are

constitutionally protected from any diminishment or impairment. *Supra* ¶ 57. Accordingly, the majority finds that "the circuit court erred in dismissing plaintiffs' claims that Public Act 97-695 is void and unenforceable under article XIII, section 5," and remands the cause for further proceedings. *Id*. As stated above, I disagree with this holding. I am also concerned, however, because the majority fails to address the remaining claims in plaintiffs' complaints, which were dismissed in the circuit court and are now before this court on direct review.

¶ 91    In addition to alleging that Public Act 97-695 violates the pension protection clause of the Illinois Constitution, two of the complaints before the circuit court alleged a violation of the contracts clause (Ill. Const. 1970, art. I, § 16); one complaint alleged a violation of the separation of powers clause (Ill. Const. 1970, art. II, § 1); and certain complaints alleged common-law claims based on contract and promissory estoppel. The majority does not address any of these claims, stating that "[o]ur holding that plaintiffs are entitled to proceed on their pension protection clause claims obviates the need to address the sufficiency of their remaining claims." *Supra* ¶ 58.

¶ 92    I do not see how the majority's determination regarding the pension protection clause claims obviates the need to address the remaining claims or provides plaintiffs with all the relief they seek. The merits of plaintiffs' pension protection clause claims remains an open question. As the Attorney General points out in her brief, "because the circuit court held that the rights claimed by the plaintiffs were not protected by the Pension Protection Clause, it had no reason to explore whether Public Act 97-695 would be an unconstitutional diminishment or impairment of those rights, or whether they were subject to a justifiable exercise of a power to adjust private contractual rights, including in contracts with the government itself." Moreover, the majority has not determined here whether Public Act 97-695 impairs or diminishes retirees' pension benefits and, thus, unconstitutionally violates the pension protection clause. That is the issue that will be decided by the circuit court on remand.

¶ 93    Because we have expressed no opinion on the merits of plaintiffs' pension protection clause claims, there remains the possibility that defendants could yet prevail on these claims. In that event, the parties would need to know whether plaintiffs may go forward on any of the other claims raised in their complaints. These additional claims were dismissed by the circuit court and plaintiffs have sought reversal of the dismissals in this court. Yet the majority does not discuss them. What does the majority's silence here mean? Does the majority mean to affirm the circuit court's dismissal of these claims? Or are they still viable because they have not been reviewed? To avoid delay and additional expense for the parties, the dismissal of these claims, which have been fully briefed and argued, should be addressed by this court.

¶ 94    For the foregoing reasons, I respectfully dissent.