2017 IL App (4th) 160417

NO. 4-16-0417

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| JOSEPHINE 'JODY' PISANI, on Behalf of Herself and a | ) | Appeal from |
| Class of Persons Similarly Situated; INTERNATIONAL | ) | Circuit Court of |
| BROTHERHOOD OF ELECTRICAL WORKERS | ) | Sangamon County |
| LOCAL 193; INTERNATIONAL UNION OF | ) | No. 15MR978 |
| PAINTERS & ALLIED TRADES COUNCIL 58; | ) | |
| INTERNATIONAL ASSOCIATION OF MACHINISTS | ) | |
| & AEROSPACE WORKERS DISTRICT 9; | ) | |
| CARPENTERS LOCAL 270; and PLUMBERS, | ) | |
| STEAMFITTERS & REFRIGERATION FITTERS | ) | |
| LOCAL 137, | ) | |
| Plaintiffs, | ) | |
| v. | ) | |
| THE CITY OF SPRINGFIELD, | ) | |
| Defendant-Appellee | ) | |
| (JOSEPHINE 'JODY' PISANI, on Behalf of Herself and a | ) | |
| Class of Persons Similarly Situated; and | ) | |
| INTERNATIONAL BROTHERHOOD OF | ) | Honorable |
| ELECTRICAL WORKERS LOCAL 193, Plaintiffs- | ) | Chris Perrin, |
| Appellants). | ) | Judge Presiding. |

JUSTICE APPLETON delivered the judgment of the court, with opinion.
Justices Holder White and Knecht concurred in the judgment and opinion.

**OPINION**

¶ 1     Plaintiffs are Josephine "Jody" Pisani and her union, the International Brotherhood of Electrical Workers Local 193. Defendant is the City of Springfield, Illinois. Pisani sues on behalf of herself and a class of defendant's employees who (1) are participants in the Illinois Municipal Retirement Fund (Fund) and (2) refrained from taking advantage of a

vacation buyback provision in defendant's code of ordinances before the city council passed an amendment, in 2015, that repealed the provision.

¶ 2     Before its repeal, the provision allowed defendant's employees to cash in their unused vacation days several months before their retirement. The lump sum boosted their final rate of earnings, thereby boosting the amount of their retirement annuity, payable out of the Fund. Plaintiffs claimed that the elimination of this pension-spiking opportunity violated the pension protection clause (Ill. Const. 1970, art. XIII, § 5) and the contracts clause (Ill. Const. 1970, art. I, § 16). They sought a declaratory judgment to that effect as well as an injunction against the enforcement of the 2015 amendment.

¶ 3     The parties filed cross-motions for summary judgment. The trial court granted defendant's motion and denied plaintiffs' motion. Plaintiffs appeal.

¶ 4     We conclude that the trial court's rulings are correct because, instead of modifying the pension contract itself, the 2015 amendment to defendant's code of ordinances changed a vacation day policy—a change that had only an incidental, indirect effect on pension benefits. Changes in the terms and conditions of employment that indirectly affect the amount of a pension by affecting a number that is plugged into the pension formula are not "diminish[ments] or impair[ments]" of pension benefits, within the meaning of the pension protection clause. Ill. Const. 1970, art. XIII, § 5.

¶ 5     Did the amendment, however, violate the contracts clause? In their brief, plaintiffs do not explain why that clause would call for a different result. They argue only the pension protection clause, as if their theory of a violation of the contracts clause were redundant and added nothing. Therefore, our conclusion as to the pension protection clause disposes of both

counts of the complaint, and we affirm the trial court's judgment.

¶ 6                                    I. BACKGROUND

¶ 7             In article 7 of the Illinois Pension Code (40 ILCS 5/7-101 *et seq.* (West 2014)), the General Assembly created the Fund, a statewide public-pension system, which is governed by a board of eight members (Board) (40 ILCS 5/7-174(a) (West 2014)). Defendant participates in the Fund. Participating municipalities and their participating employees contribute to the Fund (40 ILCS 5/7-172, 7-173 (West 2014)), and out of the invested contributions, the Board pays annuities and other benefits (40 ILCS 5/7-195 (West 2014)).

¶ 8             Annuities are payable "during the life of the annuitant" (40 ILCS 5/7-119 (West 2014)), and the amount of the annuity depends on what the employee's earnings were, among other factors. (Length of service is another factor.) Take the retirement annuity as an example. Section 7-142(a)(1)(b) of the Pension Code (40 ILCS 5/7-142(a)(1)(b) (West 2014)) provides a formula for calculating the monthly amount of the retirement annuity, and the final rate of earnings is a variable in that formula.

¶ 9             "Earnings" and "final rate of earnings" are variables, having no fixed numerical value in article 7 of the Pension Code. They have fixed meanings (40 ILCS 5/7-114, 7-116 (West 2012)) but no fixed numerical value—variables are variable. (Sometimes, in this opinion, we will cite the 2012 edition of the Illinois Compiled Statutes instead of the current, 2014 edition. The reason is that certain sections of article 7 as they appear in the 2014 edition include language added by Public Act 98-599, § 15 (eff. June 1, 2014), which the supreme court struck down, in its entirety, in *In re Pension Reform Litigation*, 2015 IL 118585, ¶ 96. Enacting an unconstitutional amendment to a statute leaves the statute as it was before the amendment—in

- 3 -

this case, as it was in the 2012 edition of the Illinois Compiled Statutes. See *People v. Gersch*, 135 Ill. 2d 384, 390 (1990).) Section 7-114(a)(1) of the Pension Code defines " '[e]arnings' " as "[t]he total amount of money paid to an employee for personal services or official duties as an employee ***, including compensation, fees, allowances, or other emolument paid for official duties." 40 ILCS 5/7-114 (West 2012). In its *amicus curiae* brief, the Board tells us it has passed a resolution stating that money for unused vacation days meets the statutory definition of earnings. The Board, however, does not provide us a copy of this resolution, nor can we find this resolution on the Board's website. It does not matter, because the parties appear to agree that money for unused vacation days meets the statutory definition of " '[e]arnings.' " *Id.*

¶ 10    The definition of " '[e]arnings' " remains the same regardless of the type of benefit. *Id.* The definition of " '[f]inal rate of earnings,' " by contrast, depends on the type of benefit. 40 ILCS 5/7-116(a), (b), (c) (West 2012). Again, we will use the retirement annuity as our example. For purposes of a retirement annuity, the " '[f]inal rate of earnings' " is "the monthly earnings obtained by dividing the total earnings received by the employee during the period of either (1) the 48 consecutive months of service within the last 120 months of service in which his total earnings were the highest or (2) the employee's total period of service, by the number of months of service in such period." 40 ILCS 5/7-116(a) (West 2012).

¶ 11    This definition of the " '[f]inal rate of earnings' " opens the door to a strategy known as "pension spiking." The Board explains:

> "Generally speaking, the amount of a [Fund] retiree's pension is based upon the
> highest [4] years of their last [10] years of [Fund] employment (the 'final rate of
> earnings'), and this typically is an employee's final [4] years of [Fund]

- 4 -

employment. Pension spiking occurs when payouts are made in excess of a person's normal salary progression up to this period. Lump-sum payments made during the final[-]rate[-]of[-]earnings period are a common cause of pension spiking."

Such a lump-sum payment could be in the form of money for unused vacation days. In any event, regardless of what the lump sum is for, the objective is to make the final rate of earnings artificially large, so as to increase the amount of the annuity.

¶ 12     Because pension spiking, to quote the Board, "is likely one of the many causes of the serious underfunding problem *** in Illinois," the General Assembly has passed laws that are calculated to prevent pension spiking. One such law is the 125% rule, which dates from January 1, 1964 (1963 Ill. Laws 2337). The 125% rule provides:

"(d) In computing the final rate of earnings: *** (5) the earnings to be considered for each of the final three months of the final earnings period for persons who first became participants before January 1, 2012[,] and the earnings to be considered for each of the final 24 months for participants who first become participants on or after January 1, 2012[,] shall not exceed 125% of the highest earnings of any other month in the final earnings period ***." 40 ILCS 5/7-116(d)(5) (West 2012).

For illustration, assume that an employee hired before January 2012 intends to retire at the end of December 2018. If, during the final three months of employment (October, November, and December 2018), the employee cashes in, say, 200 unused vacation days, the resulting artificially high earnings will be ignored, for purposes of the final rate of earnings, to the extent they exceed

125% of the employee's highest earnings in any other month during the final earnings period (the highest consecutive 48 months in the last 10 years). See *id.*

¶ 13    On September 30, 2003, defendant passed an ordinance that made possible an end run around the 125% rule. Springfield Code of Ordinances § 36.58(b)(13) (added Sept. 30, 2003). This ordinance, which we will call "the 2003 ordinance," allowed employees to collect a "lump[-]sum vacation buy back payment" *before* the final three months of the final earnings period:

> "(13) *Payment option at [Fund] Retirement:* In lieu of a lump sum payment of accumulated vacation leave at the time of termination and upon [defendant's] receipt of an employee's written statement of intent to retire pursuant to [Fund] eligibility, either regular retirement or early retirement, an employee who provides at least four months advance written notice to [defendant] of the date the employee intends to retire may elect to receive a lump sum vacation buy back payment on the last paycheck in the month following the date of the written notice of intent to retire. The amount paid shall be based on the employee's current salary at the time of the payment." *Id.*

Thus, on August 31, 2008, for example, an employee might provide defendant written notice of his or her intent to retire on December 31, 2018. The employee might cash in his or her 200 unused vacation days in September 2018. By paying this lump sum to the employee in September 2018, defendant would make the payment before "the final three months of the final earnings period," thereby avoiding application of the 125% rule. 40 ILCS 5/7-116(d)(5) (West 2012). The employee's final rate of earnings would be artificially inflated (see 40 ILCS 5/7-

142(a)(1) (West 2014)), and so would the employee's retirement annuity (see *id.*), which would be payable for life (see 40 ILCS 5/7-119 (West 2014)).

¶ 14 Several years after the passage of the 2003 ordinance, the General Assembly devised a deterrent against pension spiking, or maybe it would be more aptly characterized as a restitutionary remedy. Henceforth, pursuant to what the Board calls an "[a]ccelerated[-][p]ayment *** provision," pension spikes would come out of the municipality's budget, in the form of an up-front payment to the Fund. The provision is found in subsection (k) of section 7-172 (40 ILCS 5/7-172(k) (West 2014)), a subsection added by Public Act 97-609, § 10 (eff. Jan. 1, 2012):

"(k) If the amount of a participating employee's reported earnings for any of the 12-month periods used to determine the final rate of earnings exceeds the employee's 12 month reported earnings with the same employer for the previous year by the greater of 6% or 1.5 times the annual increase in the Consumer Price Index-U, as established by the United States Department of Labor for the preceding September, the participating municipality or participating instrumentality that paid those earnings shall pay to the Fund, in addition to any other contributions required under this Article, the present value of the increase in the pension resulting from the portion of the increase in salary that is in excess of the greater of 6% or 1.5 times the annual increase in the Consumer Price Index-U, as determined by the Fund. This present value shall be computed on the basis of the actuarial assumptions and tables used in the most recent actuarial valuation of the Fund that is available at the time of the computation." 40 ILCS 5/7-172(k)

- 7 -

(West 2014).

Basically, over and above any other contributions article 7 requires, the participating municipality has to pay the Fund the present value of an increase in the employee's pension to the extent that the increase results from an artificial inflation of the employee's earnings—and subsection (k) specifies what an artificial inflation is ("If the amount of a participating employee's reported earnings for any of the 12-month periods used to determine the final rate of earnings exceeds the employee's 12 month reported earnings with the same employer for the previous year by the greater of 6% or 1.5 times the annual increase in the Consumer Price Index-U [(for urban consumers)], as established by the United States Department of Labor for the preceding September ***." *Id*.).

¶ 15　　　　After a while, defendant began feeling the sting of the accelerated payment provision. On May 12, 2015, Melina M. Tomaras-Collins, the director of defendant's Office of Human Relations, wrote the aldermen a letter spelling out the financial implications of the 2003 ordinance. A copy of her letter is attached to plaintiffs' complaint as exhibit C. She notes that, from June 2012 to the end of 2014, defendant made over $3.5 million in accelerated payments to the Fund. On the basis of these accelerated payments that defendant has made thus far, she projects that defendant will "have a potential exposure of $44 million in accelerated payments exclusively associated with the current policy of allowing [defendant's] employees to liquidate their unused vacation time up to a year in advance of their retirement date." (Emphasis omitted.) She suggests that "abolishing this pension sp[i]ke mechanism will provide [a] positive impact on [defendant's] finances and the [taxpaying] community as a whole."

¶ 16　　　　On July 21, 2015, the city council passed an ordinance (2015 ordinance), which

repealed the lump-sum vacation payout provision of the 2003 ordinance. Springfield Code of Ordinances § 36.58(b)(13) (repealed July 21, 2015). As of June 1, 2016, defendant's employees no longer would be allowed to cash out their vacation balances up to a year in advance of their retirement date.

¶ 17        On August 19, 2015, Tomaras-Collins sent a letter to all future retirees employed by defendant, alerting them to this change—notifying them that the window for pension spiking soon would close. A copy of her letter is attached to the complaint as exhibit D, and it reads:

> "Since 2003, potential City retirees have had access to a benefit allowing them to cash out their unused vacation time for a lump sum payment up to one year in advance of their retirement date. This benefit will expire on May 31, 2016.
>
> Since you are a City employee who will be eligible to retire on or before May 31, 2017, you will be allowed to take advantage of this lump sum payment benefit provided that you submit proper notice of intent to retire on or before the expiration date stated above. Your notice of intent to retire may be submitted up to 12 months in advance of your retirement date, and your actual retirement date must be on or before May 31, 2017.
>
> We are not encouraging early retirement but to help us plan for succession, we ask that you provide as much notice as possible. Enclosed is a form that needs to be submitted regarding notice of your future retirement. *** The form must be turned in to the Office of Human Resources on or before May 31, 2016."

¶ 18        In the complaint, Pisani alleges that, for the following reasons, this change in

defendant's policy put her in a dilemma. She has been an employee of defendant for approximately 15 years and is a participant in the Fund. She "is eligible to take advantage of the pension calculation at issue in this litigation, but [she] does not want to leave City employment at this point in her career." She and the union, of which she is a member, "bring this action on behalf of a class consisting of all City employees who are [Fund] participants and who will not take advantage of the vacation pay formula currently in place before it is set to expire on May 31, 2016." In short, the dilemma was not wanting to retire as of yet, but having to choose between, on the one hand, early retirement and a pension spike or, on the other hand, to work with no pension spiking opportunity.

¶ 19 Pisani contends that she and other employees of defendant should not be put to this choice. Plaintiffs contend that the opportunity for a pension spike is constitutionally protected. Count I of their complaint seeks a declaratory judgment that the 2015 ordinance violates the pension protection clause of the Illinois Constitution (Ill. Const. 1970, art. XIII, § 5), in that "it diminishes and impairs Plaintiffs' [Fund] membership rights and pension benefits." Count II seeks a declaratory judgment that the 2015 ordinance violates the contracts clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 16), in that, "[b]y serving [defendant] as employees and making all *** contributions [to the Fund] as required by law, Plaintiffs gave good and valuable consideration to Defendant" and, consequently, are "entitled to the benefit of their contract," the obligations of which the 2015 ordinance allegedly would impair.

¶ 20 The parties filed cross-motions for summary judgment, and, on May 4, 2016, the trial court granted defendant's motion and denied plaintiffs' motion. The court reasoned as follows:

"1. The ability of [defendant's] employees to receive an early lump sum payment for unused vacation is a not a benefit of the enforceable contractual relationship resulting from membership in one of the State's pension or retirement systems. It is a local[-]employer[-]generated policy that is available to all [of defendant's] employees.

2. The ability of [defendant's] employees to receive an early lump[-]sum payment for unused vacation is not a benefit that is derived directly from membership in the [Fund] or from the *** Pension Code. It is derived solely from city ordinance and employment with [defendant].

3. The 2015 Ordinance does negatively impact the amount of a retiring City employee's earnings upon termination of employment. The earnings number is used by [the Board] in its pension calculations to determine a retiring City employee's final rate of earnings. The negative impact of this ordinance on a retiring City employee's pension annuity is incidental. *Peters v. City of Springfield*, 57 Ill. 2d 142 (1974)."

¶ 21                                    II. ANALYSIS

¶ 22          By filing cross-motions for summary judgment, the parties signified their agreement that the issues in this case were purely legal, instead of factual, and they invited the trial court to decide these legal issues. See *Bremer v. City of Rockford*, 2016 IL 119889, ¶ 20. The court did so by granting defendant's motion and denying plaintiffs' motion. Our standard of review is *de novo*. See *id.*

¶ 23 Let us, then, evaluate plaintiffs' argument anew. They argue a violation of the pension protection clause (Ill. Const. 1970, art. XIII, § 5), and, additionally, they assert a violation of the contracts clause (Ill. Const. 1970, art. I, § 16). They make no reasoned argument regarding the contracts clause as distinct from the pension protection clause. Therefore, we will disregard the invocation of the contracts clause. See *Block 418, LLC v. Uni-Tel Communications Group, Inc.*, 398 Ill. App. 3d 586, 590 (2010).

¶ 24 That leaves the pension protection clause. It provides: "Membership in any pension or retirement system of the State, any unit of local government or school district, or any agency or instrumentality thereof, shall be an enforceable contractual relationship, the benefits of which shall not be diminished or impaired." Ill. Const. 1970, art. XIII, § 5.

¶ 25 Plaintiffs claim that the vacation buyback provision in the 2003 ordinance is a pension benefit that cannot "be diminished or impaired." *Id.* They reason as follows. By the terms of the 2003 ordinance, only employees who are participants in the Fund may take advantage of the vacation buyback provision. The 2003 ordinance offers a "*Payment option at [Fund] Retirement*," and to exercise this payment option, the employee has to submit a "written statement of intent to retire pursuant to [Fund] eligibility." (The 2003 ordinance uses the initials "IMRF" to signify the Fund.) Springfield Code of Ordinances § 36.58(b)(13) (added Sept. 30, 2003). Because the vacation buyback provision is a pension-spiking benefit "limited to, conditioned on, and flow[ing] directly from membership" in the Fund, the 2015 ordinance, which purports to take this benefit away from Pisani and similarly situated employees, is unconstitutional under the pension protection clause as plaintiffs interpret it. *Kanerva v. Weems*, 2014 IL 115811, ¶ 40. In their view, the right of defendant's employees, under the 2003

- 12 -

ordinance, to convert unused vacation days to additional, lump-sum compensation, specifically for the purpose of increasing the amount of their retirement annuity, "qualifies as a benefit of the enforceable contractual relationship resulting from membership in one of the State's pension or retirement systems," and by taking this valuable pension benefit away, the 2015 ordinance violates the pension protection clause. *Id.* ¶ 38.

¶ 26    It is true that an "enforceable contractual relationship result[s] from membership in one of the State's pension or retirement systems," specifically, in this case, from membership in the Fund. *Id.* But the contractual relationship is between the participating employee and the State of Illinois. See *Schroeder v. Morton Grove Police Pension Board*, 219 Ill. App. 3d 697, 700 (1991) ("The 'contractual relationship' between the State and the employee is formed and governed by the actual terms of the contract or pension at the time the employee initially contributes to the system."); *Gualano v. City of Des Plaines*, 139 Ill. App. 3d 456, 458 (1985) ("[A]n employee's 'contractual relationship' with the State incorporates the law which exists at the time when his contractual rights to his pension vest."). Pisani has a pension contract not with defendant, but with the State—or with the Fund's eight-member board, which is an "agency or instrumentality" of the State (Ill. Const. 1970, art. XIII, § 5). See *Miller v. Retirement Board of Policemen's Annuity & Benefit Fund*, 329 Ill. App. 3d 589, 600 (2001) ("[T]he application of the [statutory] amendment to [the] plaintiffs amounted to a change in the terms of their contract with the pension system and directly diminished their benefits under the contract."); *Kraus v. Board of Trustees of the Police Pension Fund*, 72 Ill. App. 3d 833, 844 (1979) ("Application of [the statutory] amendment to [the] plaintiff would amount to a change in the terms of his contract with the pension system *** and would directly diminish his benefits under the contract."). To

be sure, Pisani has a contract with defendant, too—an employment contract—but, in this employment contract, defendant never promised to pay her a pension. As a participating municipality, defendant merely has a statutory duty to make contributions to the Fund (see 40 ILCS 5/7-172 (West 2014)), and if defendant fails to do so, the Board will have statutory remedies against defendant (see 40 ILCS 5/7-172.1(a) (West 2014)); but defendant has no contractual duty to pay Pisani a pension. That is the Board's contractual duty. See *Miller*, 329 Ill. App. 3d at 600; *Kraus*, 72 Ill. App. 3d at 844. A retirement annuity is one of the "benefits" of Pisani's "contractual relationship" with the State. Ill. Const., art. XIII, § 5. It is the State, the Board, that has contracted to pay her a retirement annuity on the conditions set forth in statutory law. The terms and conditions of her pension contract are in legislation passed by the General Assembly, not in defendant's ordinances. See *Kanerva*, 2014 IL 115811, ¶ 57 ("[T]he State's provision of health insurance premium subsidies for retirees is a benefit of membership in a pension or retirement system within the meaning of article XIII, section 5, of the Illinois Constitution, and the General Assembly was precluded from diminishing or impairing that benefit for those employees, annuitants, and survivors whose rights were governed by the version of section 10 of *the Group Insurance Act* that was in effect prior to the enactment of Public Act 97-695 \*\*\*." (Emphasis added.)); *Di Falco v. Board of Trustees of the Firemen's Pension Fund of the Wood Dale Fire Protection District No. One*, 122 Ill. 2d 22, 26 (1988) ("[T]he 'contractual relationship' is governed by the actual terms of *the Pension Code* at the time the employee becomes a member of the pension system." (Emphasis added.)); *In re Marriage of Winter*, 387 Ill. App. 3d 21, 34 (2008) (same). Because the vacation buyback provision was in defendant's ordinance instead of in Illinois statutory law, it was not a benefit of the "contractual

- 14 -

relationship" to which the pension protection clause refers. Ill. Const. 1970, art. XIII, § 5.

¶ 27      The cases on which plaintiffs rely in their brief are distinguishable because, in all those cases, the General Assembly attempted to modify the pension contract by amending Illinois statutory law. See *Pension Reform Litigation*, 2015 IL 118585, ¶ 27; *Kanerva*, 2014 IL 115811, ¶ 1; *Buddell v. Board of Trustees, State University Retirement System of Illinois*, 118 Ill. 2d 99, 101 (1987); *Felt v. Board of Trustees of the Judges Retirement System*, 107 Ill. 2d 158, 160 (1985); *Miller*, 329 Ill. App. 3d at 600. In all those cases, a party to the pension contract, the State, diminished or impaired pension benefits by modifying the Pension Code or the State Employees Group Insurance Act of 1971. That is not what happened in this case. Instead, defendant had an employment policy, which was expressed in an ordinance, and defendant revised its employment policy by passing another ordinance.

¶ 28      To express our point in a slightly different way, if "[m]embership in [a] pension or retirement system of the State" is "an enforceable contractual relationship, the benefits of which shall not be diminished or impaired," that is just an elaborate way of saying the benefits of membership in the pension or retirement system of the State shall not be diminished or impaired. Ill. Const. 1970, art. XIII, § 5. The vacation buyback provision was *not* a benefit of membership in the Fund, a pension or retirement system of the State. If it were, *all* members of the Fund would have had the vacation buyback option, simply by virtue of being members of the Fund— but they did not. Instead, it was uniquely a benefit of being an employee of defendant, until the 2015 ordinance took that benefit away.

¶ 29      We realize that changes in the terms and conditions of employment can have just as palpable an effect on pension benefits as amendments to Illinois statutory law. By reducing an

- 15 -

employee's rate of compensation—or, more drastically, by laying off the employee—a municipality could just as effectively diminish the employee's future pension as a cost-saving amendment to the Pension Code could. The diminishment would be no less real for being indirect. Nevertheless, in the case the trial court cited, *Peters*, the supreme court held the pension protection clause to be inapplicable to a change in the terms and conditions of employment, even though the change would cause the employee to receive a smaller pension than he otherwise might have received. *Peters*, 57 Ill. 2d at 151-52.

¶ 30        In *Peters*, defendant adopted an ordinance reducing the mandatory retirement age of its police officers and firefighters from 63 years to 60 years. *Id.* at 143-44. The plaintiffs, who were firefighters 60 years of age or older (*id.* at 150), challenged the ordinance as unconstitutional under the pension protection clause (*id.* at 143-44). They argued the ordinance had " 'diminishe[d] and impair[ed] their pension rights' " by " 'forcing [them] to retire before [they had] obtain[ed] their maximum pension benefits.' " *Id.* at 144.

¶ 31        The supreme court was unpersuaded that, just because a change in the terms and conditions of employment took away an opportunity to maximize pension benefits, the change violated the pension protection clause. *Id.* at 151-52. The supreme court reasoned as follows:

> "The firemen's pension fund formula is based on salary and length of service and obviously any change in these variables will affect the amount of the pension. Municipal employment is not static and a number of factors might require that a public position be abolished, its functions changed, or the terms of employment modified. Although this court has not previously considered the nature of the 'enforceable contractual relationship' contemplated by section 5 of

- 16 -

article XIII, a similar provision is contained in the Constitution of New York and has been construed by the courts of that State. [Citations.] From our review of the constitutional debates and the authorities, we conclude that the purpose and intent of the constitutional provision was to insure that pension rights of public employees which had been earned should not be 'diminished or impaired' but that it was not intended, and did not serve, to prevent the defendant City from reducing the maximum retirement age, even though the reduction might affect the pensions which plaintiffs would ultimately have received." *Id.*

The import of that quoted passage is that a change in "salary" is not a " 'diminish[ment] or impair[ment]' " of pension benefits within the meaning of the pension protection clause, even though the change "will affect the amount of the pension." *Id.* (quoting Ill. Const. 1970, art. XIII, § 5). The same logic applies to a change in the final rate of earnings. The contractual relationship between Pisani and the Board is a relationship in which the final rate of earnings is a variable, having no fixed numerical value (see 40 ILCS 5/7-142(a)(1) (West 2014)), just as, in *Peters*, the contractual relationship between firefighters and the pension fund was a relationship in which the length of service was a variable (*Peters*, 57 Ill. 2d at 151). The pension contract was *the formula*, with its variables, and no matter what numbers were plugged into the formula, it—and therefore the pension contract—remained the same. The final rate of earnings in the present case is like the length of service in *Peters*: they are variables, $x$ and $y$. The point of *Peters* is that the pension protection clause protects the statutory formula, not the inputs from the employment relationship.

¶ 32        Plaintiffs point out that, in *Miller*, 329 Ill. App. 3d at 601, the appellate court distinguished *Peters*, and plaintiffs seem to imply that, in the present case, *Peters* is

distinguishable for the same reason it was in *Miller*. Actually, *Miller* is significantly different from the present case because, in *Miller*, the General Assembly amended the Pension Code. *Id.* at 600. The amendment changed the pension formula that was enshrined in Illinois statutory law, substituting one variable of the formula for another variable, and the new variable had a detrimental effect on the plaintiffs' pensions. *Id.* "Unlike *Peters*," the appellate court remarked, "the amendment *** did not create a mere incidental effect on pension calculations but, rather, directly changed a fixed variable in the pension formula." *Id.* at 601. In the present case, by contrast, there was no change to the Pension Code. There was no change to the statutory formula by which the monthly amount of the retirement annuity was calculated. Instead, there was a change to the terms and conditions of employment, and this change had an incidental, indirect effect on the amount of the retirement annuity. Therefore, it is *Miller* that is distinguishable from the present case, and *Peters* is directly on point.

¶ 33                          III. CONCLUSION

¶ 34          For the foregoing reasons, we affirm the trial court's judgment.

¶ 35          Affirmed.

- 18 -